EASTMAN KODAK CO. *v.* IMAGE TECHNICAL SERV-
ICES, INC., ET AL.

No. 90–1029.   Argued December 10, 1991—Decided June 8, 1992

BLACKMUN, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, STEVENS, KENNEDY, and SOUTER, JJ., joined. SCALIA, J., filed a dissenting opinion, in which O'CONNOR and THOMAS, JJ., joined, *post,* p. 486.

*Donn P. Pickett* argued the cause for petitioner. With him on the briefs were *Daniel M. Wall, Alfred C. Pfeiffer, Jr.,* and *Jonathan W. Romeyn.*

*Assistant Attorney General Rill* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Starr, Deputy Solicitor General Wallace, Christopher J. Wright, Catherine G. O'Sullivan,* and *Robert B. Nicholson.*

*James A. Hennefer* argued the cause for respondents. With him on the brief were *A. Kirk McKenzie, Douglas E. Rosenthal, Jonathan M. Jacobson,* and *Elinor R. Hoffmann.**

---

*Briefs of *amici curiae* urging reversal were filed for the Computer and Business Equipment Manufacturers Association by *Simon Lazarus III;* for Digital Equipment Corp. et al. by *Kurt W. Melchior, Robert A. Skitol, James A. Meyers, Marcia Howe Adams, Ivor Cary Armistead III, Ronald A. Stern, Stephen Wasinger, James W. Olson, Carter G. Phillips, Ralph I. Miller,* and *Florinda J. Iascone;* for the Motor Vehicle Manufacturers Association of the United States, Inc., by *Thomas B. Leary, William H.*

454

JUSTICE BLACKMUN delivered the opinion of the Court.

This is yet another case that concerns the standard for summary judgment in an antitrust controversy. The

Crabtree, and *Charles H. Lockwood II;* and for the National Electrical Manufacturers Association by *James S. Dittmar* and *James L. Messenger.*

Briefs of *amici curiae* urging affirmance were filed for the State of Ohio et al. by *Lee Fisher,* Attorney General of Ohio, *Simon Karas,* and *Elizabeth H. Watts* and *Marc B. Bandman,* Assistant Attorneys General, *James H. Evans,* Attorney General of Alabama, and *Marc Givhan,* Assistant Attorney General, *Charles E. Cole,* Attorney General of Alaska, and *James Forbes,* Assistant Attorney General, *Grant Woods,* Attorney General of Arizona, and *Jeri K. Auther,* Assistant Attorney General, *Winston Bryant,* Attorney General of Arkansas, and *Royce Griffin,* Deputy Attorney General, *Daniel E. Lungren,* Attorney General of California, *Roderick E. Walston,* Chief Assistant Attorney General, *Sanford N. Gruskin,* Assistant Attorney General, and *Kathleen E. Foote,* Deputy Attorney General, *Richard Blumenthal,* Attorney General of Connecticut, and *Robert M. Langer,* Assistant Attorney General, *Robert A. Butterworth,* Attorney General of Florida, and *Jerome W. Hoffman,* Assistant Attorney General, *Warren Price III,* Attorney General of Hawaii, *Robert A. Marks,* Supervising Deputy Attorney General, and *Ted Clause,* Deputy Attorney General, *Larry EchoHawk,* Attorney General of Idaho, *Roland W. Burris,* Attorney General of Illinois, *Rosalyn Kaplan,* Solicitor General, and *Christine Rosso,* Senior Assistant Attorney General, *Bonnie J. Campbell,* Attorney General of Iowa, and *John R. Perkins,* Deputy Attorney General, *Robert T. Stephan,* Attorney General of Kansas, and *Mary Ann Heckman,* Assistant Attorney General, *Frederic J. Cowan,* Attorney General of Kentucky, and *James M. Ringo,* Assistant Attorney General, *William J. Guste, Jr.,* Attorney General of Louisiana, and *Anne F. Benoit,* Assistant Attorney General, *Michael E. Carpenter,* Attorney General of Maine, and *Stephen L. Wessler,* Deputy Attorney General, *J. Joseph Curran, Jr.,* Attorney General of Maryland, and *Robert N. McDonald* and *Ellen S. Cooper,* Assistant Attorneys General, *Scott Harshbarger,* Attorney General of Massachusetts, and *George K. Weber,* Assistant Attorney General, *Frank J. Kelley,* Attorney General of Michigan, *Hubert H. Humphrey III,* Attorney General of Minnesota, *Thomas F. Pursell,* Deputy Attorney General, and *James P. Spencer* and *Susan C. Gretz,* Special Assistant Attorneys General, *Frankie Sue Del Pappa,* Attorney General of Nevada, and *Rob Kirkman,* Deputy Attorney General, *Robert J. Del Tufo,* Attorney General of New Jersey, and *Laurel A. Price,* Deputy Attorney General, *Robert Abrams,* Attorney General of New York, *O. Peter Sherwood,* Solici-

principal issue here is whether a defendant's lack of market power in the primary equipment market precludes—as a matter of law—the possibility of market power in derivative aftermarkets.

Petitioner Eastman Kodak Company manufactures and sells photocopiers and micrographic equipment. Kodak also sells service and replacement parts for its equipment. Respondents are 18 independent service organizations (ISO's) that in the early 1980's began servicing Kodak copying and micrographic equipment. Kodak subsequently adopted policies to limit the availability of parts to ISO's and to make it more difficult for ISO's to compete with Kodak in servicing Kodak equipment.

tor General, and *George W. Sampson,* Assistant Attorney General, *Lacy H. Thornburg,* Attorney General of North Carolina, *James C. Gulick,* Special Deputy Attorney General, and *K. D. Sturgis,* Assistant Attorney General, *Dan Morales,* Attorney General of Texas, *Will Pryor,* First Assistant Attorney General, *Mary F. Keller,* Deputy Attorney General, and *Mark Tobey,* Assistant Attorney General, *R. Paul Van Dam,* Attorney General of Utah, and *Arthur M. Strong,* Assistant Attorney General, *Jeffrey L. Amestoy,* Attorney General of Vermont, and *Geoff Yudien,* Assistant Attorney General, *Kenneth O. Eikenberry,* Attorney General of Washington, and *Carol A. Smith,* Assistant Attorney General, and *Mario J. Palumbo,* Attorney General of West Virginia, and *Donna S. Quesenberry,* Assistant Attorney General; for the Automotive Warehouse Distributors Association et al. by *Donald A. Randall, Louis R. Marchese, Robert J. Verdisco,* and *Basil J. Mezines;* for Bell Atlantic Business Systems Services, Inc., by *Richard G. Taranto, Joel I. Klein,* and *John M. Kelleher;* for Grumman Corporation by *Patrick O. Killian;* for the National Association of State Purchasing Officials et al. by *Richard D. Monkman;* for the National Office Machine Dealers Association et al. by *Mark P. Cohen;* for the National Retail Federation by *Michael J. Altier;* for Public Citizen by *Alan B. Morrison;* for State Farm Mutual Automobile Insurance Co. et al. by *Melvin Spaeth, James F. Fitzpatrick,* and *Melvin C. Garbow.*

Briefs of *amici curiae* were filed for the California State Electronics Association et al. by *Richard I. Fine;* for Computer Service Network International by *Ronald S. Katz;* and for the National Electronics Sales and Service Dealers Association by *Ronald S. Katz.*

Respondents instituted this action in the United States District Court for the Northern District of California, alleging that Kodak's policies were unlawful under both § 1 and § 2 of the Sherman Act, 26 Stat. 209, as amended, 15 U. S. C. §§ 1 and 2 (1988 ed., Supp. II). After truncated discovery, the District Court granted summary judgment for Kodak. The Court of Appeals for the Ninth Circuit reversed. The appellate court found that respondents had presented sufficient evidence to raise a genuine issue concerning Kodak's market power in the service and parts markets. It rejected Kodak's contention that lack of market power in service and parts must be assumed when such power is absent in the equipment market. Because of the importance of the issue, we granted certiorari. 501 U. S. 1216 (1991).

## I

## A

Because this case comes to us on petitioner Kodak's motion for summary judgment, "[t]he evidence of [respondents] is to be believed, and all justifiable inferences are to be drawn in [their] favor." *Anderson* v. *Liberty Lobby, Inc.*, 477 U. S. 242, 255 (1986); *Matsushita Electric Industrial Co.* v. *Zenith Radio Corp.*, 475 U. S. 574, 587 (1986). Mindful that respondents' version of any disputed issue of fact thus is presumed correct, we begin with the factual basis of respondents' claims. See *Arizona* v. *Maricopa County Medical Society*, 457 U. S. 332, 339 (1982).

Kodak manufactures and sells complex business machines—as relevant here, high-volume photocopiers and micrographic equipment.[1] Kodak equipment is unique; micro-

---

[1] Kodak's micrographic equipment includes four different product areas. The first is capture products such as microfilmers and electronic scanners, which compact an image and capture it on microfilm. The second is equipment such as microfilm viewers and viewer/printers. This equipment is used to retrieve the images. The third is Computer Output Microform (COM) recorders, which are data-processing peripherals that record

graphic software programs that operate on Kodak machines, for example, are not compatible with competitors' machines. See App. 424–425, 487–489, 537. Kodak parts are not compatible with other manufacturers' equipment, and vice versa. See *id.*, at 432, 413–415. Kodak equipment, although expensive when new, has little resale value. See *id.*, at 358–359, 424–425, 427–428, 467, 505–506, 519–521.

Kodak provides service and parts for its machines to its customers. It produces some of the parts itself; the rest are made to order for Kodak by independent original-equipment manufacturers (OEM's). See *id.*, at 429, 465, 490, 496. Kodak does not sell a complete system of original equipment, lifetime service, and lifetime parts for a single price. Instead, Kodak provides service after the initial warranty period either through annual service contracts, which include all necessary parts, or on a per-call basis. See *id.*, at 98–99; Brief for Petitioner 3. It charges, through negotiations and bidding, different prices for equipment, service, and parts for different customers. See App. 420–421, 536. Kodak provides 80% to 95% of the service for Kodak machines. See *id.*, at 430.

Beginning in the early 1980's, ISO's began repairing and servicing Kodak equipment. They also sold parts and reconditioned and sold used Kodak equipment. Their customers were federal, state, and local government agencies, banks, insurance companies, industrial enterprises, and providers of specialized copy and microfilming services. See *id.*, at 417, 419–421, 492–493, 499, 516, 539. ISO's provide service at a price substantially lower than Kodak does. See *id.*, at 414, 451, 453–454, 469, 474–475, 488, 493, 536–537; Lodging 133. Some customers found that the ISO service was of higher quality. See App. 425–426, 537–538.

---

computer-generated data onto microfilm. The fourth is Computer Assisted Retrieval (CAR) systems, which utilize computers to locate and retrieve micrographic images. See App. 156–158.

Some ISO customers purchase their own parts and hire ISO's only for service. See Lodging 144–147. Others choose ISO's to supply both service and parts. See *id.*, at 133. ISO's keep an inventory of parts, purchased from Kodak or other sources, primarily the OEM's.[2] See App. 99, 415–416, 490.

In 1985 and 1986, Kodak implemented a policy of selling replacement parts for micrographic and copying machines only to buyers of Kodak equipment who use Kodak service or repair their own machines. See Brief for Petitioner 6; App. 91–92, 98–100, 140–141, 171–172, 190, 442–447, 455–456, 483–484.

As part of the same policy, Kodak sought to limit ISO access to other sources of Kodak parts. Kodak and the OEM's agreed that the OEM's would not sell parts that fit Kodak equipment to anyone other than Kodak. See *id.*, at 417, 428–429, 447, 468, 474, 496. Kodak also pressured Kodak equipment owners and independent parts distributors not to sell Kodak parts to ISO's. See *id.*, at 419–420, 428–429, 483–484, 517–518, 589–590. In addition, Kodak took steps to restrict the availability of used machines. See *id.*, at 427–428, 465–466, 510–511, 520.

Kodak intended, through these policies, to make it more difficult for ISO's to sell service for Kodak machines. See *id.*, at 106–107, 171, 516. It succeeded. ISO's were unable to obtain parts from reliable sources, see *id.*, at 429, 468, 496, and many were forced out of business, while others lost substantial revenue. See *id.*, at 422, 458–459, 464, 468, 475–477, 482–484, 495–496, 501, 521. Customers were forced to switch to Kodak service even though they preferred ISO service. See *id.*, at 420–422.

---

[2] In addition to the OEM's, other sources of Kodak parts include (1) brokers who would buy parts from Kodak, or strip used Kodak equipment to obtain the useful parts and resell them, (2) customers who buy parts from Kodak and make them available to ISO's, and (3) used equipment to be stripped for parts. See *id.*, at 419, 517; Brief for Petitioner 38.

B

In 1987, the ISO's filed the present action in the District Court, alleging, *inter alia*, that Kodak had unlawfully tied the sale of service for Kodak machines to the sale of parts, in violation of § 1 of the Sherman Act, and had unlawfully monopolized and attempted to monopolize the sale of service for Kodak machines, in violation of § 2 of that Act.[3]

Kodak filed a motion for summary judgment before respondents had initiated discovery. The District Court permitted respondents to file one set of interrogatories and one set of requests for production of documents and to take six depositions. Without a hearing, the District Court granted summary judgment in favor of Kodak. App. to Pet. for Cert. 29B.

As to the § 1 claim, the court found that respondents had provided no evidence of a tying arrangement between Kodak equipment and service or parts. See *id.*, at 32B–33B. The court, however, did not address respondents' § 1 claim that is at issue here. Respondents allege a tying arrangement not between Kodak *equipment* and service, but between Kodak *parts* and service. As to the § 2 claim, the District Court concluded that although Kodak had a "natural monopoly over the market for parts it sells under its name," a unilateral refusal to sell those parts to ISO's did not violate § 2.

---

[3] Section 1 of the Sherman Act states in relevant part: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U. S. C. § 1 (1988 ed., Supp. II).

Section 2 of the Sherman Act states: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $10,000,000 if a corporation, or, if any other person, $350,000, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court." 15 U. S. C. § 2 (1988 ed., Supp. II).

The Court of Appeals for the Ninth Circuit, by a divided vote, reversed. 903 F. 2d 612 (1990). With respect to the § 1 claim, the court first found that whether service and parts were distinct markets and whether a tying arrangement existed between them were disputed issues of fact. *Id.*, at 615–616. Having found that a tying arrangement might exist, the Court of Appeals considered a question not decided by the District Court: Was there "an issue of material fact as to whether Kodak has sufficient economic power in the tying product market [parts] to restrain competition appreciably in the tied product market [service]." *Id.*, at 616. The court agreed with Kodak that competition in the equipment market might prevent Kodak from possessing power in the parts market, but refused to uphold the District Court's grant of summary judgment "on this theoretical basis" because "market imperfections can keep economic theories about how consumers will act from mirroring reality." *Id.*, at 617. Noting that the District Court had not considered the market power issue, and that the record was not fully developed through discovery, the court declined to require respondents to conduct market analysis or to pinpoint specific imperfections in order to withstand summary judgment.[4] "It is enough that [respondents] have presented evidence of actual events from which a reasonable trier of fact could conclude that . . . competition in the [equipment] market does not, in reality, curb Kodak's power in the parts market." *Ibid.*

---

[4] Specifically, the Court of Appeals explained that the District Court had denied the request for further discovery made by respondents in their opposition to Kodak's summary judgment motion: "For example, [respondents] requested to depose two ISO customers who allegedly would not sign accurate statements concerning Kodak's market power in the parts market. Not finding it necessary to reach the market power issue in its decision, the district court, of course, had no reason to grant this request." 903 F. 2d, at 617, n. 4.

The court then considered the three business justifications Kodak proffered for its restrictive parts policy: (1) to guard against inadequate service, (2) to lower inventory costs, and (3) to prevent ISO's from free-riding on Kodak's investment in the copier and micrographic industry. The court concluded that the trier of fact might find the product quality and inventory reasons to be pretextual and that there was a less restrictive alternative for achieving Kodak's quality-related goals. *Id.*, at 618–619. The court also found Kodak's third justification, preventing ISO's from profiting on Kodak's investments in the equipment markets, legally insufficient. *Id.*, at 619.

As to the § 2 claim, the Court of Appeals concluded that sufficient evidence existed to support a finding that Kodak's implementation of its parts policy was "anticompetitive" and "exclusionary" and "involved a specific intent to monopolize." *Id.*, at 620. It held that the ISO's had come forward with sufficient evidence, for summary judgment purposes, to disprove Kodak's business justifications. *Ibid.*

The dissent in the Court of Appeals, with respect to the § 1 claim, accepted Kodak's argument that evidence of competition in the equipment market *"necessarily* precludes power in the derivative market." *Id.*, at 622 (emphasis in original). With respect to the § 2 monopolization claim, the dissent concluded that, entirely apart from market power considerations, Kodak was entitled to summary judgment on the basis of its first business justification because it had "submitted extensive and undisputed evidence of a marketing strategy based on high-quality service." *Id.*, at 623.

## II

A tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Northern Pacific R. Co.* v. *United States*, 356 U. S. 1, 5–6

(1958). Such an arrangement violates § 1 of the Sherman Act if the seller has "appreciable economic power" in the tying product market and if the arrangement affects a substantial volume of commerce in the tied market. *Fortner Enterprises, Inc.* v. *United States Steel Corp.*, 394 U. S. 495, 503 (1969).

Kodak did not dispute that its arrangement affects a substantial volume of interstate commerce. It, however, did challenge whether its activities constituted a "tying arrangement" and whether Kodak exercised "appreciable economic power" in the tying market. We consider these issues in turn.

### A

For respondents to defeat a motion for summary judgment on their claim of a tying arrangement, a reasonable trier of fact must be able to find, first, that service and parts are two distinct products, and, second, that Kodak has tied the sale of the two products.

For service and parts to be considered two distinct products, there must be sufficient consumer demand so that it is efficient for a firm to provide service separately from parts. *Jefferson Parish Hospital Dist. No. 2* v. *Hyde*, 466 U. S. 2, 21–22 (1984). Evidence in the record indicates that service and parts have been sold separately in the past and still are sold separately to self-service equipment owners.[5] Indeed, the development of the entire high-technology service industry is evidence of the efficiency of a separate market for service.[6]

---

[5] The Court of Appeals found: "Kodak's policy of allowing customers to purchase parts on condition that they agree to service their own machines suggests that the demand for parts can be separated from the demand for service." *Id.*, at 616.

[6] *Amicus* briefs filed by various service organizations attest to the magnitude of the service business. See, *e. g.*, Brief for Computer Service Network International as *Amicus Curiae;* Brief for National Electronics Sales and Service Dealers Association as *Amicus Curiae;* Brief for Cali-

Kodak insists that because there is no demand for parts separate from service, there cannot be separate markets for service and parts. Brief for Petitioner 15, n. 3. By that logic, we would be forced to conclude that there can never be separate markets, for example, for cameras and film, computers and software, or automobiles and tires. That is an assumption we are unwilling to make. "We have often found arrangements involving functionally linked products at least one of which is useless without the other to be prohibited tying devices." *Jefferson Parish*, 466 U. S., at 19, n. 30.

Kodak's assertion also appears to be incorrect as a factual matter. At least some consumers would purchase service without parts, because some service does not require parts, and some consumers, those who self-service for example, would purchase parts without service.[7] Enough doubt is cast on Kodak's claim of a unified market that it should be resolved by the trier of fact.

Finally, respondents have presented sufficient evidence of a tie between service and parts. The record indicates that Kodak would sell parts to third parties only if they agreed not to buy service from ISO's.[8]

fornia State Electronics Association et al. as *Amici Curiae;* Brief for National Office Machine Dealers et al. as *Amici Curiae.*

[7] The dissent suggests that parts and service are not separate products for tying purposes because all service may involve installation of parts. *Post*, at 494–495, n. 2. Because the record does not support this factual assertion, under the approach of both the Court and the concurrence in *Jefferson Parish Hospital Dist. No. 2 v. Hyde*, 466 U. S. 2 (1984), Kodak is not entitled to summary judgment on whether parts and service are distinct markets.

[8] In a footnote, Kodak contends that this practice is only a unilateral refusal to deal, which does not violate the antitrust laws. See Brief for Petitioner 15, n. 4. Assuming, *arguendo*, that Kodak's refusal to sell parts to any company providing service can be characterized as a unilateral refusal to deal, its alleged sale of parts to third parties on condition that they buy service from Kodak is not. See 903 F. 2d, at 619.

## B

Having found sufficient evidence of a tying arrangement, we consider the other necessary feature of an illegal tying arrangement: appreciable economic power in the tying market. Market power is the power "to force a purchaser to do something that he would not do in a competitive market." *Jefferson Parish*, 466 U. S., at 14.[9] It has been defined as "the ability of a single seller to raise price and restrict output." *Fortner*, 394 U. S., at 503; *United States* v. *E. I. du Pont de Nemours & Co.*, 351 U. S. 377, 391 (1956). The existence of such power ordinarily is inferred from the seller's possession of a predominant share of the market. *Jefferson Parish*, 466 U. S., at 17; *United States* v. *Grinnell Corp.*, 384 U. S. 563, 571 (1966); *Times-Picayune Publishing Co.* v. *United States*, 345 U. S. 594, 611–613 (1953).

### 1

Respondents contend that Kodak has more than sufficient power in the parts market to force unwanted purchases of the tied market, service. Respondents provide evidence that certain parts are available exclusively through Kodak. Respondents also assert that Kodak has control over the availability of parts it does not manufacture. According to respondents' evidence, Kodak has prohibited independent manufacturers from selling Kodak parts to ISO's, pressured Kodak equipment owners and independent parts distributors to deny ISO's the purchase of Kodak parts, and taken steps to restrict the availability of used machines.

---

[9] "[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms. When such 'forcing' is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated." *Jefferson Parish*, 466 U. S., at 12.

Respondents also allege that Kodak's control over the parts market has excluded service competition, boosted service prices, and forced unwilling consumption of Kodak service. Respondents offer evidence that consumers have switched to Kodak service even though they preferred ISO service, that Kodak service was of higher price and lower quality than the preferred ISO service, and that ISO's were driven out of business by Kodak's policies. Under our prior precedents, this evidence would be sufficient to entitle respondents to a trial on their claim of market power.

## 2

Kodak counters that even if it concedes monopoly *share* of the relevant parts market, it cannot actually exercise the necessary market *power* for a Sherman Act violation. This is so, according to Kodak, because competition exists in the equipment market.[10] Kodak argues that it could not have

---

[10] In their brief and at oral argument, respondents argued that Kodak's market share figures for high-volume copy machines, CAR systems, and micrographic-capture equipment demonstrate Kodak's market power in the equipment market. Brief for Respondents 16–18, 32–33; Tr. of Oral Arg. 28–31.

In the Court of Appeals, however, respondents did not contest Kodak's assertion that its market shares indicated a competitive equipment market. The Court of Appeals believed that respondents "do not dispute Kodak's assertion that it lacks market power in the [equipment] markets." 903 F. 2d, at 616, n. 3. Nor did respondents question Kodak's asserted lack of market power in their brief in opposition to the petition for certiorari, although they acknowledged that Kodak's entire case rested on its understanding that respondents were not disputing the existence of competition in the equipment market. Brief in Opposition 8.

Recognizing that on summary judgment we may examine the record *de novo* without relying on the lower courts' understanding, *United States* v. *Diebold, Inc.*, 369 U. S. 654, 655 (1962), respondents now ask us to decline to reach the merits of the questions presented in the petition, and instead to affirm the Ninth Circuit's judgment based on the factual dispute over market power in the equipment market. We decline respondents' invitation. We stated in *Oklahoma City* v. *Tuttle*, 471 U. S. 808, 816 (1985): "Our decision to grant certiorari represents a commitment of scarce judi-

the ability to raise prices of service and parts above the level that would be charged in a competitive market because any increase in profits from a higher price in the aftermarkets at least would be offset by a corresponding loss in profits from lower equipment sales as consumers began purchasing equipment with more attractive service costs.

Kodak does not present any actual data on the equipment, service, or parts markets. Instead, it urges the adoption of a substantive legal rule that "equipment competition precludes any finding of monopoly power in derivative aftermarkets." Brief for Petitioner 33. Kodak argues that such a rule would satisfy its burden as the moving party of showing "that there is no genuine issue as to any material fact" on the market power issue.[11] See Fed. Rule Civ. Proc. 56(c).

Legal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored

---

cial resources with a view to deciding the merits of one or more of the questions presented in the petition." Because respondents failed to bring their objections to the premise underlying the questions presented to our attention in their opposition to the petition for certiorari, we decide those questions based on the same premise as the Court of Appeals, namely, that competition exists in the equipment market.

[11] Kodak argues that such a rule would be *per se*, with no opportunity for respondents to rebut the conclusion that market power is lacking in the parts market. See Brief for Petitioner 30–31 ("There is nothing that respondents could prove that would overcome Kodak's conceded lack of market power"); *id.*, at 30 (discovery is "pointless" once the "dispositive fact" of lack of market power in the equipment market is conceded); *id.*, at 22 (Kodak's lack of market power in the equipment market "dooms any attempt to extract monopoly profits" even in an allegedly imperfect market); *id.*, at 25 (it is "impossible" for Kodak to make more total profit by overcharging its existing customers for service).

As an apparent second-best alternative, Kodak suggests elsewhere in its brief that the rule would permit a defendant to meet its summary judgment burden under Federal Rule of Civil Procedure 56(c); the burden would then shift to the plaintiffs to "prove . . . that there is specific reason to believe that normal economic reasoning does not apply." Brief for Petitioner 30. This is the United States' position. See Brief for United States as *Amicus Curiae* 10–11.

in antitrust law. This Court has preferred to resolve antitrust claims on a case-by-case basis, focusing on the "particular facts disclosed by the record." *Maple Flooring Manufacturers Assn.* v. *United States*, 268 U. S. 563, 579 (1925); *Du Pont*, 351 U. S., at 395, n. 22; *Continental T. V., Inc.* v. *GTE Sylvania Inc.*, 433 U. S. 36, 70 (1977) (WHITE, J., concurring in judgment).[12] In determining the existence of market power, and specifically the "responsiveness of the sales of one product to price changes of the other," *Du Pont*, 351 U. S., at 400; see also *id.*, at 394–395, and 400–401, this Court has examined closely the economic reality of the market at issue.[13]

Kodak contends that there is no need to examine the facts when the issue is market power in the aftermarkets. A legal presumption against a finding of market power is warranted in this situation, according to Kodak, because the existence of market power in the service and parts markets absent power in the equipment market "simply makes no economic sense," and the absence of a legal presumption would deter procompetitive behavior. *Matsushita*, 475 U. S., at 587; *id.*, at 594–595.

Kodak analogizes this case to *Matsushita*, where a group of American corporations that manufactured or sold consumer electronic products alleged that their 21 Japanese counterparts were engaging in a 20-year conspiracy to price

---

[12] See generally *Business Electronics Corp.* v. *Sharp Electronics Corp.*, 485 U. S. 717, 723–726 (1988); *FTC* v. *Indiana Federation of Dentists*, 476 U. S. 447, 458–459 (1986); *National Collegiate Athletic Assn.* v. *Board of Regents of Univ. of Okla.*, 468 U. S. 85, 100–104 (1984); *Continental T. V., Inc.* v. *GTE Sylvania Inc.*, 433 U. S., at 59.

[13] See, *e. g.*, *Jefferson Parish*, 466 U. S., at 26–29; *United States* v. *Connecticut National Bank*, 418 U. S. 656, 661–666 (1974); *United States* v. *Grinnell Corp.*, 384 U. S. 563, 571–576 (1966); *International Boxing Club of New York, Inc.* v. *United States*, 358 U. S. 242, 250–251 (1959); see also *Jefferson Parish*, 466 U. S., at 37, n. 6 (O'CONNOR, J., concurring) (citing cases and describing the careful consideration the Court gives to the particular facts when determining market power).

below cost in the United States in the hope of expanding their market share sometime in the future. After several years of detailed discovery, the defendants moved for summary judgment. *Id.*, at 577–582. Because the defendants had every incentive not to engage in the alleged conduct which required them to sustain losses for decades with no foreseeable profits, the Court found an "absence of any rational motive to conspire." *Id.*, at 597. In that context, the Court determined that the plaintiffs' theory of predatory pricing made no practical sense, was "speculative," and was not "reasonable." *Id.*, at 588, 590, 593, 595, 597. Accordingly, the Court held that a reasonable jury could not return a verdict for the plaintiffs and that summary judgment would be appropriate against them unless they came forward with more persuasive evidence to support their theory. *Id.*, at 587–588, 595–598.

The Court's requirement in *Matsushita* that the plaintiffs' claims make economic sense did not introduce a special burden on plaintiffs facing summary judgment in antitrust cases. The Court did not hold that if the moving party enunciates *any* economic theory supporting its behavior, regardless of its accuracy in reflecting the actual market, it is entitled to summary judgment. *Matsushita* demands only that the nonmoving party's inferences be reasonable in order to reach the jury, a requirement that was not invented, but merely articulated, in that decision.[14] If the plaintiff's theory is eco-

---

[14] See, *e. g., Anderson* v. *Liberty Lobby, Inc.*, 477 U. S. 242, 248 (1986) ("[S]ummary judgment will not lie ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party"); *Monsanto Co.* v. *Spray-Rite Service Corp.*, 465 U. S. 752, 768 (1984) (to survive summary judgment there must be evidence that "reasonably tends to prove" plaintiff's theory); *First National Bank of Arizona* v. *Cities Service Co.*, 391 U. S. 253, 288–289 (1968) (defendant meets his burden under Rule 56(c) when he "conclusively show[s] that the facts upon which [the plaintiff] relied to support his allegation were not susceptible of the interpretation which he sought to give them"); *Eastman Kodak Co. of New York* v. *Southern Photo Materials Co.*, 273 U. S. 359, 375 (1927). See also *H. L. Hayden*

nomically senseless, no reasonable jury could find in its favor, and summary judgment should be granted.

Kodak, then, bears a substantial burden in showing that it is entitled to summary judgment. It must show that despite evidence of increased prices and excluded competition, an inference of market power is unreasonable. To determine whether Kodak has met that burden, we must unravel the factual assumptions underlying its proposed rule that lack of power in the equipment market necessarily precludes power in the aftermarkets.

The extent to which one market prevents exploitation of another market depends on the extent to which consumers will change their consumption of one product in response to a price change in another, i. e., the "cross-elasticity of demand." See *Du Pont*, 351 U. S., at 400; P. Areeda & L. Kaplow, Antitrust Analysis ¶ 342(c) (4th ed. 1988).[15] Ko-

_____

*Co. of New York, Inc.* v. *Siemens Medical Systems, Inc.*, 879 F. 2d 1005, 1012 (CA2 1989) ("[O]nly *reasonable* inferences can be drawn from the evidence in favor of the nonmoving party") (emphasis in original); *Arnold Pontiac-GMC, Inc.* v. *Budd Baer, Inc.*, 826 F. 2d 1335, 1339 (CA3 1987) (*Matsushita* directs us " 'to consider whether the inference of conspiracy is reasonable' "); *Instructional Systems Development Corp.* v. *Aetna Casualty & Surety Co.*, 817 F. 2d 639, 646 (CA10 1987) (summary judgment not appropriate under *Matsushita* when defendants "could reasonably have been economically motivated").

[15] What constrains the defendant's ability to raise prices in the service market is "the elasticity of demand faced by the defendant—the degree to which its sales fall . . . as its price rises." Areeda & Kaplow ¶ 342(c), p. 576.

Courts usually have considered the relationship between price in one market and demand in another in defining the relevant market. Because market power is often inferred from market share, market definition generally determines the result of the case. Pitofsky, New Definitions of Relevant Market and the Assault on Antitrust, 90 Colum. L. Rev. 1805, 1806–1813 (1990). Kodak chose to focus on market power directly rather than arguing that the relationship between equipment and service and parts is such that the three should be included in the same market definition. Whether considered in the conceptual category of "market definition" or "market power," the ultimate inquiry is the same—whether competition

dak's proposed rule rests on a factual assumption about the cross-elasticity of demand in the equipment and aftermarkets: "If Kodak raised its parts or service prices above competitive levels, potential customers would simply stop buying Kodak equipment. Perhaps Kodak would be able to increase short term profits through such a strategy, but at a devastating cost to its long term interests."[16] Brief for Petitioner 12. Kodak argues that the Court should accept, as a matter of law, this "basic economic realit[y]," *id.*, at 24, that competition in the equipment market necessarily prevents market power in the aftermarkets.[17]

Even if Kodak could not raise the price of service and parts one cent without losing equipment sales, that fact would not disprove market power in the aftermarkets. The sales of even a monopolist are reduced when it sells goods at a monopoly price, but the higher price more than compensates for the loss in sales. Areeda & Kaplow ¶¶ 112 and 340(a). Kodak's claim that charging more for service and parts would be "a short-run game," Brief for Petitioner 26, is based on the false dichotomy that there are only two prices

---

in the equipment market will significantly restrain power in the service and parts markets.

[16] The United States as *amicus curiae* in support of Kodak echoes this argument: "The ISOs' claims are implausible because Kodak lacks market power in the markets for its copier and micrographic equipment. Buyers of such equipment regard an increase in the price of parts or service as an increase in the price of the equipment, and sellers recognize that the revenues from sales of parts and service are attributable to sales of the equipment. In such circumstances, it is not apparent how an equipment manufacturer such as Kodak could exercise power in the aftermarkets for parts and service." Brief for United States as *Amicus Curiae* 8.

[17] It is clearly true, as the United States claims, that Kodak "cannot set service or parts prices without regard to the impact on the market for equipment." *Id.*, at 20. The fact that the cross-elasticity of demand is not zero proves nothing; the disputed issue is how much of an impact an increase in parts and service prices has on equipment sales and on Kodak's profits.

that can be charged—a competitive price or a ruinous one. But there could easily be a middle, optimum price at which the increased revenues from the higher priced sales of service and parts would more than compensate for the lower revenues from lost equipment sales. The fact that the equipment market imposes a restraint on prices in the aftermarkets by no means disproves the existence of power in those markets. See Areeda & Kaplow ¶ 340(b) ("[T]he existence of significant substitution in the event of *further* price increases or even at the *current* price does not tell us whether the defendant *already* exercises significant market power") (emphasis in original). Thus, contrary to Kodak's assertion, there is no immutable physical law—no "basic economic reality"—insisting that competition in the equipment market cannot coexist with market power in the aftermarkets.

We next consider the more narrowly drawn question: Does Kodak's theory describe actual market behavior so accurately that respondents' assertion of Kodak market power in the aftermarkets, if not impossible, is at least unreasonable?[18] Cf. *Matsushita Electric Industrial Co.* v. *Zenith Radio Corp.*, 475 U. S. 574 (1986).

---

[18] Although Kodak repeatedly relies on *Continental T. V.* as support for its factual assertion that the equipment market will prevent exploitation of the service and parts markets, the case is inapposite. In *Continental T. V.*, the Court found that a manufacturer's policy restricting the number of retailers that were permitted to sell its product could have a procompetitive effect. See 433 U. S., at 55. The Court also noted that any negative effect of exploitation of the intrabrand market (the competition between retailers of the same product) would be checked by competition in the interbrand market (competition over the same generic product) because consumers would substitute a different brand of the same product. Unlike *Continental T. V.*, this case does not concern vertical relationships between parties on different levels of the same distribution chain. In the relevant market, service, Kodak and the ISO's are direct competitors; their relationship is horizontal. The interbrand competition at issue here is competition over the provision of service. Despite petitioner's best effort,

To review Kodak's theory, it contends that higher service prices will lead to a disastrous drop in equipment sales. Presumably, the theory's corollary is to the effect that low service prices lead to a dramatic increase in equipment sales. According to the theory, one would have expected Kodak to take advantage of lower priced ISO service as an opportunity to expand equipment sales. Instead, Kodak adopted a restrictive sales policy consciously designed to eliminate the lower priced ISO service, an act that would be expected to devastate either Kodak's equipment sales or Kodak's faith in its theory. Yet, according to the record, it has done neither. Service prices have risen for Kodak customers, but there is no evidence or assertion that Kodak equipment sales have dropped.

Kodak and the United States attempt to reconcile Kodak's theory with the contrary actual results by describing a "marketing strategy of spreading over time the total cost to the buyer of Kodak equipment." Brief for United States as *Amicus Curiae* 18; see also Brief for Petitioner 18. In other words, Kodak could charge subcompetitive prices for equipment and make up the difference with supracompetitive prices for service, resulting in an overall competitive price. This pricing strategy would provide an explanation for the theory's descriptive failings—if Kodak in fact had adopted it. But Kodak never has asserted that it prices its equipment or parts subcompetitively and recoups its profits through service. Instead, it claims that it prices its equipment comparably to its competitors and intends that both its equipment sales and service divisions be profitable. See App. 159–161, 170, 178, 188. Moreover, this hypothetical pricing strategy is inconsistent with Kodak's policy toward its self-service customers. If Kodak were underpricing its equipment, hoping to lock in customers and recover its losses in the service

---

repeating the mantra "interbrand competition" does not transform this case into one over an agreement the manufacturer has with its dealers that would fall under the rubric of *Continental T. V.*

market, it could not afford to sell customers parts without service. In sum, Kodak's theory does not explain the actual market behavior revealed in the record.

Respondents offer a forceful reason why Kodak's theory, although perhaps intuitively appealing, may not accurately explain the behavior of the primary and derivative markets for complex durable goods: the existence of significant information and switching costs. These costs could create a less responsive connection between service and parts prices and equipment sales.

For the service-market price to affect equipment demand, consumers must inform themselves of the total cost of the "package"—equipment, service, and parts—at the time. of purchase; that is, consumers must engage in accurate life-cycle pricing.[19] Life-cycle pricing of complex, durable equipment is difficult and costly. In order to arrive at an accurate price, a consumer must acquire a substantial amount of raw data and undertake sophisticated analysis. The necessary information would include data on price, quality, and availability of products needed to operate, upgrade, or enhance the initial equipment, as well as service and repair costs, including estimates of breakdown frequency, nature of repairs, price of service and parts, length of "downtime," and losses incurred from downtime.[20]

Much of this information is difficult—some of it impossible—to acquire at the time of purchase. During the life of a product, companies may change the service and parts prices, and develop products with more advanced features, a

[19] See Craswell, Tying Requirements in Competitive Markets: The Consumer Protection Issues, 62 B. U. L. Rev. 661, 676 (1982); Beales, Craswell, & Salop, The Efficient Regulation of Consumer Information, 24 J. Law & Econ. 491, 509–511 (1981); Jefferson Parish, 466 U. S., at 15.

[20] In addition, of course, in order to price accurately the equipment, a consumer would need initial purchase information such as prices, features, quality, and available warranties for different machinery with different capabilities, and residual value information such as the longevity of product use and its potential resale or trade-in value.

474

decreased need for repair, or new warranties. In addition, the information is likely to be customer specific; lifecycle costs will vary from customer to customer with the type of equipment, degrees of equipment use, and costs of downtime.

Kodak acknowledges the cost of information, but suggests, again without evidentiary support, that customer information needs will be satisfied by competitors in the equipment markets. Brief for Petitioner 26, n. 11. It is a question of fact, however, whether competitors would provide the necessary information. A competitor in the equipment market may not have reliable information about the lifecycle costs of complex equipment it does not service or the needs of customers it does not serve. Even if competitors had the relevant information, it is not clear that their interests would be advanced by providing such information to consumers. See 2 P. Areeda & D. Turner, Antitrust Law ¶ 404b1 (1978).[21]

Moreover, even if consumers were capable of acquiring and processing the complex body of information, they may choose not to do so. Acquiring the information is expensive. If the costs of service are small relative to the equipment price, or if consumers are more concerned about equipment capabilities than service costs, they may not find it cost efficient to

---

[21] To inform consumers about Kodak, the competitor must be willing to forgo the opportunity to reap supracompetitive prices in its own service and parts markets. The competitor may anticipate that charging lower service and parts prices and informing consumers about Kodak in the hopes of gaining future equipment sales will cause Kodak to lower the price on its service and parts, canceling any gains in equipment sales to the competitor and leaving both worse off. Thus, in an equipment market with relatively few sellers, competitors may find it more profitable to adopt Kodak's service and parts policy than to inform the consumers. See 2 Areeda & Turner, Antitrust Law ¶ 404b1; App. 177 (Kodak, Xerox, and IBM together have nearly 100% of relevant market).

Even in a market with many sellers, any one competitor may not have sufficient incentive to inform consumers because the increased patronage attributable to the corrected consumer beliefs will be shared among other competitors. Beales, Craswell, & Salop, 24 J. Law & Econ., at 503–504, 506.

compile the information. Similarly, some consumers, such as the Federal Government, have purchasing systems that make it difficult to consider the complete cost of the "package" at the time of purchase. State and local governments often treat service as an operating expense and equipment as a capital expense, delegating each to a different department. These governmental entities do not lifecycle price, but rather choose the lowest price in each market. See Brief for National Association of State Purchasing Officials et al. as *Amici Curiae*; Brief for State of Ohio et al. as *Amici Curiae*; App. 429–430.

As Kodak notes, there likely will be some large-volume, sophisticated purchasers who will undertake the comparative studies and insist, in return for their patronage, that Kodak charge them competitive lifecycle prices. Kodak contends that these knowledgeable customers will hold down the package price for all other customers. Brief for Petitioner 23, n. 9. There are reasons, however, to doubt that sophisticated purchasers will ensure that competitive prices are charged to unsophisticated purchasers, too. As an initial matter, if the number of sophisticated customers is relatively small, the amount of profits to be gained by supracompetitive pricing in the service market could make it profitable to let the knowledgeable consumers take their business elsewhere. More importantly, if a company is able to price discriminate between sophisticated and unsophisticated consumers, the sophisticated will be unable to prevent the exploitation of the uninformed. A seller could easily price discriminate by varying the equipment/parts/service package, developing different warranties, or offering price discounts on different components.

Given the potentially high cost of information and the possibility that a seller may be able to price discriminate between knowledgeable and unsophisticated consumers, it makes little sense to assume, in the absence of any evidentiary support, that equipment-purchasing decisions are based

on an accurate assessment of the total cost of equipment, service, and parts over the lifetime of the machine.[22]

Indeed, respondents have presented evidence that Kodak practices price discrimination by selling parts to customers who service their own equipment, but refusing to sell parts to customers who hire third-party service companies. Companies that have their own service staff are likely to be high-volume users, the same companies for whom it is most likely to be economically worthwhile to acquire the complex information needed for comparative lifecycle pricing.

A second factor undermining Kodak's claim that supracompetitive prices in the service market lead to ruinous losses in equipment sales is the cost to current owners of switching to a different product. See Areeda & Turner ¶ 519a.[23] If the cost of switching is high, consumers who already have purchased the equipment, and are thus "locked in," will tolerate some level of service-price increases before changing equipment brands. Under this scenario, a seller profitably could maintain supracompetitive prices in the aftermarket if the switching costs were high relative to the increase in service prices, and the number of locked-in customers were high relative to the number of new purchasers.

Moreover, if the seller can price discriminate between its locked-in customers and potential new customers, this strategy is even more likely to prove profitable. The seller could simply charge new customers below-marginal cost on the equipment and recoup the charges in service, or offer pack-

---

[22] See Salop & Stiglitz, Bargains and Ripoffs: A Model of Monopolistically Competitive Price Dispersion, 44 Rev. Econ. Studies 493 (1977); Salop, Information and Market Structure—Information and Monopolistic Competition, 66 Am. Econ. Rev. 240 (1976); Stigler, The Economics of Information, 69 J. Pol. Econ. 213 (1961).

[23] A firm can exact leverage whenever other equipment is not a ready substitute. F. Scherer & D. Ross, Industrial Market Structure and Economic Performance 16–17 (3d ed. 1990).

ages with lifetime warranties or long-term service agreements that are not available to locked-in customers.

Respondents have offered evidence that the heavy initial outlay for Kodak equipment, combined with the required support material that works only with Kodak equipment, makes switching costs very high for existing Kodak customers. And Kodak's own evidence confirms that it varies the package price of equipment/parts/service for different customers.

In sum, there is a question of fact whether information costs and switching costs foil the simple assumption that the equipment and service markets act as pure complements to one another.[24]

We conclude, then, that Kodak has failed to demonstrate that respondents' inference of market power in the service and parts markets is unreasonable, and that, consequently, Kodak is entitled to summary judgment. It is clearly reasonable to infer that Kodak has market power to raise prices and drive out competition in the aftermarkets, since respondents offer direct evidence that Kodak did so.[25] It is also plausible, as discussed above, to infer that Kodak chose to gain immediate profits by exerting that market power where locked-in customers, high information costs, and discriminatory pricing limited and perhaps eliminated any long-

---

[24] The dissent disagrees based on its hypothetical case of a tie between equipment and service. "The only thing lacking" to bring this case within the hypothetical case, states the dissent, "is concrete evidence that the restrictive parts policy was . . . generally known." *Post*, at 492. But the dissent's "only thing lacking" is the crucial thing lacking—evidence. Whether a tie between parts and service should be treated identically to a tie between equipment and service, as the dissent and Kodak argue, depends on whether the equipment market prevents the exertion of market power in the parts market. Far from being "anomalous," *post*, at 492–493, requiring Kodak to provide evidence on this factual question is completely consistent with our prior precedent. See, *e. g.*, n. 13, *supra*.

[25] Cf. *Instructional Systems*, 817 F. 2d, at 646 (finding the conspiracy reasonable under *Matsushita* because its goals were in fact achieved).

term loss. Viewing the evidence in the light most favorable to respondents, their allegations of market power "mak[e] . . . economic sense." Cf. *Matsushita,* 475 U. S., at 587.

Nor are we persuaded by Kodak's contention that it is entitled to a legal presumption on the lack of market power because, as in *Matsushita,* there is a significant risk of deterring procompetitive conduct. Plaintiffs in *Matsushita* attempted to prove the antitrust conspiracy "through evidence of rebates and other price-cutting activities." *Id.,* at 594. Because cutting prices to increase business is "the very essence of competition," the Court was concerned that mistaken inferences would be "especially costly" and would "chill the very conduct the antitrust laws are designed to protect." *Ibid.* See also *Monsanto Co.* v. *Spray-Rite Service Corp.,* 465 U. S. 752, 763 (1984) (permitting inference of concerted action would "deter or penalize perfectly legitimate conduct"). But the facts in this case are just the opposite. The alleged conduct—higher service prices and market foreclosure—is facially anticompetitive and exactly the harm that antitrust laws aim to prevent. In this situation, *Matsushita* does not create any presumption in favor of summary judgment for the defendant.

Kodak contends that, despite the appearance of anticompetitiveness, its behavior actually favors competition because its ability to pursue innovative marketing plans will allow it to compete more effectively in the equipment market. Brief for Petitioner 40–41. A pricing strategy based on lower equipment prices and higher aftermarket prices could enhance equipment sales by making it easier for the buyer to finance the initial purchase.[26] It is undisputed that competition is enhanced when a firm is able to offer various marketing options, including bundling of support and maintenance service with the sale of equipment. Nor do such ac-

---

[26] It bears repeating that in this case Kodak has never claimed that it is in fact pursuing such a pricing strategy.

tions run afoul of the antitrust laws.[27] But the procompetitive effect of the specific conduct challenged here, eliminating all consumer parts and service options, is far less clear.[28]

We need not decide whether Kodak's behavior has any procompetitive effects and, if so, whether they outweigh the anticompetitive effects. We note only that Kodak's service and parts policy is simply not one that appears always or almost always to enhance competition, and therefore to warrant a legal presumption without any evidence of its actual economic impact. In this case, when we weigh the risk of deterring procompetitive behavior by proceeding to trial against the risk that illegal behavior will go unpunished, the balance tips against summary judgment. Cf. *Matsushita*, 475 U. S., at 594–595.

For the foregoing reasons, we hold that Kodak has not met the requirements of Federal Rule of Civil Procedure 56(c). We therefore affirm the denial of summary judgment on respondents' § 1 claim.[29]

---

[27] See *Jefferson Parish*, 466 U. S., at 12 ("Buyers often find package sales attractive; a seller's decision to offer such packages can merely be an attempt to compete effectively—conduct that is entirely consistent with the Sherman Act"). See also Yates & DiResta, Software Support and Hardware Maintenance Practices: Tying Considerations, The Computer Lawyer, Vol. 8, No. 6, p. 17 (1991) (describing various service and parts policies that enhance quality and sales but do not violate the antitrust laws).

[28] Two of the largest consumers of service and parts contend that they are worse off when the equipment manufacturer also controls service and parts. See Brief for State Farm Mutual Automobile Insurance Co. et al. as *Amici Curiae;* Brief for State of Ohio et al. as *Amici Curiae.*

[29] The dissent urges a radical departure in this Court's antitrust law. It argues that because Kodak has only an "inherent" monopoly in parts for its equipment, *post*, at 489–490, the antitrust laws do not apply to its efforts to expand that power into other markets. The dissent's proposal to grant *per se* immunity to manufacturers competing in the service market would exempt a vast and growing sector of the economy from antitrust laws. Leaving aside the question whether the Court has the authority to

## III

Respondents also claim that they have presented genuine issues for trial as to whether Kodak has monopolized, or at-

make such a policy decision, there is no support for it in our jurisprudence or the evidence in this case.

Even assuming, despite the absence of any proof from the dissent, that all manufacturers possess some inherent market power in the parts market, it is not clear why that should immunize them from the antitrust laws in another market. The Court has held many times that power gained through some natural and legal advantage such as a patent, copyright, or business acumen can give rise to liability if "a seller exploits his dominant position in one market to expand his empire into the next." *Times-Picayune Publishing Co.* v. *United States,* 345 U. S. 594, 611 (1953); see, *e. g., Northern Pacific R. Co.* v. *United States,* 356 U. S. 1 (1958); *United States* v. *Paramount Pictures, Inc.,* 334 U. S. 131 (1948); *Leitch Mfg. Co.* v. *Barber Co.,* 302 U. S. 458, 463 (1938). Moreover, on the occasions when the Court has considered tying in derivative aftermarkets by manufacturers, it has not adopted any exception to the usual antitrust analysis, treating derivative aftermarkets as it has every other separate market. See *International Salt Co.* v. *United States,* 332 U. S. 392 (1947); *International Business Machines Corp.* v. *United States,* 298 U. S. 131 (1936); *United Shoe Machinery Corp.* v. *United States,* 258 U. S. 451 (1922). Our past decisions are reason enough to reject the dissent's proposal. See *Patterson* v. *McLean Credit Union,* 491 U. S. 164, 172–173 (1989) ("Considerations of *stare decisis* have special force in the area of statutory interpretation, for here, unlike in the context of constitutional interpretation, the legislative power is implicated, and Congress remains free to alter what we have done").

Nor does the record in this case support the dissent's proposed exemption for aftermarkets. The dissent urges its exemption because the tie here "does not permit the manufacturer to project power over a class of consumers distinct from that which it is already able to exploit (and fully) without the inconvenience of the tie." *Post,* at 498. Beyond the dissent's obvious difficulty in explaining why Kodak would adopt this expensive tying policy if it could achieve the same profits more conveniently through some other means, respondents offer an alternative theory, supported by the record, that suggests Kodak *is* able to exploit some customers who in the absence of the tie would be protected from increases in parts prices by knowledgeable customers. See *supra,* at 475–476.

At bottom, whatever the ultimate merits of the dissent's theory, at this point it is mere conjecture. Neither Kodak nor the dissent have provided

tempted to monopolize, the service and parts markets in violation of § 2 of the Sherman Act. "The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States* v. *Grinnell Corp.*, 384 U. S., at 570–571.

## A

The existence of the first element, possession of monopoly power, is easily resolved. As has been noted, respondents have presented a triable claim that service and parts are separate markets, and that Kodak has the "power to control prices or exclude competition" in service and parts. *Du Pont*, 351 U. S., at 391. Monopoly power under § 2 requires, of course, something greater than market power under § 1. See *Fortner*, 394 U. S., at 502. Respondents' evidence that Kodak controls nearly 100% of the parts market and 80% to 95% of the service market, with no readily available substitutes, is, however, sufficient to survive summary judgment under the more stringent monopoly standard of § 2. See *National Collegiate Athletic Assn.* v. *Board of Regents of Univ. of Okla.*, 468 U. S. 85, 112 (1984). Cf. *United States* v. *Grinnell Corp.*, 384 U. S., at 571 (87% of the market is a monopoly); *American Tobacco Co.* v. *United States*, 328 U. S. 781, 797 (1946) (over two-thirds of the market is a monopoly).

Kodak also contends that, as a matter of law, a single brand of a product or service can never be a relevant market under the Sherman Act. We disagree. The relevant mar-

---

any evidence refuting respondents' theory of forced unwanted purchases at higher prices and price discrimination. While it may be, as the dissent predicts, that the equipment market will prevent any harms to consumers in the aftermarkets, the dissent never makes plain why the Court should accept that theory on faith rather than requiring the usual evidence needed to win a summary judgment motion.

ket for antitrust purposes is determined by the choices available to Kodak equipment owners. See *Jefferson Parish*, 466 U. S., at 19. Because service and parts for Kodak equipment are not interchangeable with other manufacturers' service and parts, the relevant market from the Kodak equipment owner's perspective is composed of only those companies that service Kodak machines. See *Du Pont*, 351 U. S., at 404 ("The market is composed of products that have reasonable interchangeability").[30] This Court's prior cases support the proposition that in some instances one brand of a product can constitute a separate market. See *National Collegiate Athletic Assn.*, 468 U. S., at 101–102, 111–112; *International Boxing Club of New York, Inc.* v. *United States*, 358 U. S. 242, 249–252 (1959); *International Business Machines Corp.* v. *United States*, 298 U. S. 131 (1936).[31] The proper market definition in this case can be determined only after a factual inquiry into the "commercial realities" faced by consumers. *United States* v. *Grinnell Corp.*, 384 U. S., at 572.

### B

The second element of a § 2 claim is the use of monopoly power "to foreclose competition, to gain a competitive advan-

---

[30] Kodak erroneously contends that this Court in *Du Pont* rejected the notion that a relevant market could be limited to one brand. Brief for Petitioner 33. The Court simply held in *Du Pont* that one brand does not *necessarily* constitute a relevant market if substitutes are available. 351 U. S., at 393. See also *Boxing Club*, 358 U. S., at 249–250. Here respondents contend there are no substitutes.

[31] Other courts have limited the market to parts for a particular brand of equipment. See, *e. g., International Logistics Group, Ltd.* v. *Chrysler Corp.*, 884 F. 2d 904, 905, 908 (CA6 1989) (parts for Chrysler cars is the relevant market), cert. denied, 494 U. S. 1066 (1990); *Dimidowich* v. *Bell & Howell*, 803 F. 2d 1473, 1480–1481, n. 3 (CA9 1986), modified, 810 F. 2d 1517 (1987) (service for Bell & Howell equipment is the relevant market); *In re General Motors Corp.*, 99 F. T. C. 464, 554, 584 (1982) (crash parts for General Motors cars is the relevant market); *Heatransfer Corp.* v. *Volkswagenwerk A. G.*, 553 F. 2d 964 (CA5 1977) (air conditioners for Volkswagens is the relevant market), cert. denied, 434 U. S. 1087 (1978).

tage, or to destroy a competitor." *United States* v. *Griffith,* 334 U. S. 100, 107 (1948). If Kodak adopted its parts and service policies as part of a scheme of willful acquisition or maintenance of monopoly power, it will have violated § 2. *Grinnell Corp.,* 384 U. S., at 570–571; *United States* v. *Aluminum Co. of America,* 148 F. 2d 416, 432 (CA2 1945); *Aspen Skiing Co.* v. *Aspen Highlands Skiing Corp.,* 472 U. S. 585, 600–605 (1985).[32]

As recounted at length above, respondents have presented evidence that Kodak took exclusionary action to maintain its parts monopoly and used its control over parts to strengthen its monopoly share of the Kodak service market. Liability turns, then, on whether "valid business reasons" can explain Kodak's actions. *Id.,* at 605; *United States* v. *Aluminum Co. of America,* 148 F. 2d, at 432. Kodak contends that it has three valid business justifications for its actions: "(1) to promote interbrand equipment competition by allowing Kodak to stress the quality of its service; (2) to improve asset management by reducing Kodak's inventory costs; and (3) to prevent ISOs from free-riding on Kodak's capital investment in equipment, parts and service." Brief for Petitioner 6. Factual questions exist, however, about the validity and sufficiency of each claimed justification, making summary judgment inappropriate.

Kodak first asserts that by preventing customers from using ISO's, "it [can] best maintain high quality service for its sophisticated equipment" and avoid being "blamed for an equipment malfunction, even if the problem is the result of improper diagnosis, maintenance or repair by an ISO." *Id.,* at 6–7. Respondents have offered evidence that ISO's provide quality service and are preferred by some Kodak equipment owners. This is sufficient to raise a genuine issue of

---

[32] It is true that as a general matter a firm can refuse to deal with its competitors. But such a right is not absolute; it exists only if there are legitimate competitive reasons for the refusal. See *Aspen Skiing Co.,* 472 U. S., at 602–605.

fact. See *International Business Machines Corp.* v. *United States*, 298 U. S., at 139–140 (rejecting IBM's claim that it had to control the cards used in its machines to avoid "injury to the reputation of the machines and the good will of" IBM in the absence of proof that other companies could not make quality cards); *International Salt Co.* v. *United States*, 332 U. S. 392, 397–398 (1947) (rejecting International Salt's claim that it had to control the supply of salt to protect its leased machines in the absence of proof that competitors could not supply salt of equal quality).

Moreover, there are other reasons to question Kodak's proffered motive of commitment to quality service; its quality justification appears inconsistent with its thesis that consumers are knowledgeable enough to lifecycle price, and its self-service policy. Kodak claims the exclusive-service contract is warranted because customers would otherwise blame Kodak equipment for breakdowns resulting from inferior ISO service. Thus, Kodak simultaneously claims that its customers are sophisticated enough to make complex and subtle lifecycle-pricing decisions, and yet too obtuse to distinguish which breakdowns are due to bad equipment and which are due to bad service. Kodak has failed to offer any reason why informational sophistication should be present in one circumstance and absent in the other. In addition, because self-service customers are just as likely as others to blame Kodak equipment for breakdowns resulting from (their own) inferior service, Kodak's willingness to allow self-service casts doubt on its quality claim. In sum, we agree with the Court of Appeals that respondents "have presented evidence from which a reasonable trier of fact could conclude that Kodak's first reason is pretextual." 903 F. 2d, at 618.

There is also a triable issue of fact on Kodak's second justification—controlling inventory costs. As respondents argue, Kodak's actions appear inconsistent with any need to control inventory costs. Presumably, the inventory of parts

needed to repair Kodak machines turns only on breakdown rates, and those rates should be the same whether Kodak or ISO's perform the repair. More importantly, the justification fails to explain respondents' evidence that Kodak forced OEM's, equipment owners, and parts brokers not to sell parts to ISO's, actions that would have no effect on Kodak's inventory costs.

Nor does Kodak's final justification entitle it to summary judgment on respondents' § 2 claim. Kodak claims that its policies prevent ISO's from "exploit[ing] the investment Kodak has made in product development, manufacturing and equipment sales in order to take away Kodak's service revenues." Brief for Petitioner 7–8. Kodak does not dispute that respondents invest substantially in the service market, with training of repair workers and investment in parts inventory. Instead, according to Kodak, the ISO's are free-riding because they have failed to enter the equipment and parts markets. This understanding of free-riding has no support in our case law.[33] To the contrary, as the Court of Appeals noted, one of the evils proscribed by the antitrust laws is the creation of entry barriers to potential competitors by requiring them to enter two markets simultaneously. *Jefferson Parish*, 466 U. S., at 14; *Fortner*, 394 U. S., at 509.

None of Kodak's asserted business justifications, then, are sufficient to prove that Kodak is "entitled to a judgment as

---

[33] Kodak claims that both *Continental T. V.* and *Monsanto* support its free-rider argument. Neither is applicable. In both *Continental T. V.*, 433 U. S., at 55, and *Monsanto*, 465 U. S., at 762–763, the Court accepted free-riding as a justification because without restrictions a manufacturer would not be able to induce competent and aggressive retailers to make the kind of investment of capital and labor necessary to distribute the product. In *Continental T. V.* the relevant market level was retail sale of televisions and in *Monsanto* retail sales of herbicides. Some retailers were investing in those markets; others were not, relying, instead, on the investment of the other retailers. To be applicable to this case, the ISO's would have to be relying on Kodak's investment in the service market; that, however, is not Kodak's argument.

a matter of law" on respondents' §2 claim. Fed. Rule Civ. Proc. 56(c).

## IV

In the end, of course, Kodak's arguments may prove to be correct. It may be that its parts, service, and equipment are components of one unified market, or that the equipment market does discipline the aftermarkets so that all three are priced competitively overall, or that any anticompetitive effects of Kodak's behavior are outweighed by its competitive effects. But we cannot reach these conclusions as a matter of law on a record this sparse. Accordingly, the judgment of the Court of Appeals denying summary judgment is affirmed.

*It is so ordered.*

JUSTICE SCALIA, with whom JUSTICE O'CONNOR and JUSTICE THOMAS join, dissenting.

This is not, as the Court describes it, just "another case that concerns the standard for summary judgment in an antitrust controversy." *Ante*, at 454. Rather, the case presents a very narrow—but extremely important—question of substantive antitrust law: whether, for purposes of applying our *per se* rule condemning "ties," and for purposes of applying our exacting rules governing the behavior of would-be monopolists, a manufacturer's conceded lack of power in the interbrand market for its equipment is somehow consistent with its possession of "market," or even "monopoly," power in wholly derivative aftermarkets for that equipment. In my view, the Court supplies an erroneous answer to this question, and I dissent.

## I

*Per se* rules of antitrust illegality are reserved for those situations where logic and experience show that the risk of injury to competition from the defendant's behavior is so pronounced that it is needless and wasteful to conduct the usual judicial inquiry into the balance between the behavior's pro-

competitive benefits and its anticompetitive costs. See, *e. g.*, *Arizona* v. *Maricopa County Medical Society*, 457 U. S. 332, 350–351 (1982). "The character of the restraint produced by [behavior to which a *per se* rule applies] is considered a sufficient basis for presuming unreasonableness without the necessity of any analysis of the market context in which the [behavior] may be found." *Jefferson Parish Hospital Dist. No. 2* v. *Hyde*, 466 U. S. 2, 9 (1984). The *per se* rule against tying is just such a rule: Where the conditions precedent to application of the rule are met, *i. e.*, where the tying arrangement is backed up by the defendant's market power in the "tying" product, the arrangement is adjudged in violation of § 1 of the Sherman Act, 15 U. S. C. § 1 (1988 ed., Supp. II), without *any* inquiry into the practice's actual effect on competition and consumer welfare. But see *United States* v. *Jerrold Electronics Corp.*, 187 F. Supp. 545, 560 (ED Pa. 1960), aff'd, 365 U. S. 567 (1961) *(per curiam)* (accepting affirmative defense to *per se* tying allegation).

Despite intense criticism of the tying doctrine in academic circles, see, *e. g.*, R. Bork, The Antitrust Paradox 365–381 (1978), the stated rationale for our *per se* rule has varied little over the years. When the defendant has genuine "market power" in the tying product—the power to raise price by reducing output—the tie potentially enables him to extend that power into a second distinct market, enhancing barriers to entry in each. In addition:

> "[T]ying arrangements may be used to evade price control in the tying product through clandestine transfer of the profit to the tied product; they may be used as a counting device to effect price discrimination; and they may be used to force a full line of products on the customer so as to extract more easily from him a monopoly return on one unique product in the line." *Fortner Enterprises, Inc.* v. *United States Steel Corp.*, 394 U. S. 495, 513–514 (1969) *(Fortner I)* (WHITE, J., dissenting) (footnotes omitted).

For these reasons, as we explained in *Jefferson Parish,* "the law draws a distinction between the exploitation of market power by merely enhancing the price of the tying product, on the one hand, and by attempting to impose restraints on competition in the market for a tied product, on the other." 466 U. S., at 14.

Our § 2 monopolization doctrines are similarly directed to discrete situations in which a defendant's possession of substantial market power, combined with his exclusionary or anticompetitive behavior, threatens to defeat or forestall the corrective forces of competition and thereby sustain or extend the defendant's agglomeration of power. See *United States* v. *Grinnell Corp.,* 384 U. S. 563, 570–571 (1966). Where a defendant maintains substantial market power, his activities are examined through a special lens: Behavior that might otherwise not be of concern to the antitrust laws—or that might even be viewed as procompetitive—can take on exclusionary connotations when practiced by a monopolist. 3 P. Areeda & D. Turner, Antitrust Law ¶ 813, pp. 300–302 (1978) (hereinafter 3 Areeda & Turner).

The concerns, however, that have led the courts to heightened scrutiny both of the "exclusionary conduct" practiced by a monopolist and of tying arrangements subject to *per se* prohibition, are completely without force when the participants lack market power. As to the former, "[t]he [very] definition of exclusionary conduct," as practiced by a monopolist, is "predicated on the existence of substantial market power." *Id.,* ¶ 813, at 301; see, *e. g., Walker Process Equipment, Inc.* v. *Food Machinery & Chemical Corp.,* 382 U. S. 172, 177–178 (1965) (fraudulent patent procurement); *Standard Oil Co. of New Jersey* v. *United States,* 221 U. S. 1, 75 (1911) (acquisition of competitors); 3 Areeda & Turner ¶ 724, at 195–197 (vertical integration). And with respect to tying, we have recognized that bundling arrangements not coerced by the heavy hand of market power can serve the procompetitive functions of facilitating new entry into cer-

tain markets, see, *e. g., Brown Shoe Co.* v. *United States,* 370 U. S. 294, 330 (1962), permitting "clandestine price cutting in products which otherwise would have no price competition at all because of fear of retaliation from the few other producers dealing in the market," *Fortner I, supra,* at 514, n. 9 (WHITE, J., dissenting), assuring quality control, see, *e. g., Standard Oil Co. of Cal.* v. *United States,* 337 U. S. 293, 306 (1949), and, where "the tied and tying products are functionally related, . . . reduc[ing] costs through economies of joint production and distribution." *Fortner I, supra,* at 514, n. 9 (WHITE, J., dissenting). "Accordingly, we have [only] condemned tying arrangements [under the *per se* rule] when the seller has some special ability—usually called 'market power'—to force a purchaser to do something that he would not do in a competitive market." *Jefferson Parish, supra,* at 13–14.

The Court today finds in the typical manufacturer's inherent power over its own brand of equipment—over the sale of distinctive repair parts for that equipment, for example—the sort of "monopoly power" sufficient to bring the sledgehammer of § 2 into play. And, not surprisingly in light of that insight, it readily labels single-brand power over aftermarket products "market power" sufficient to permit an antitrust plaintiff to invoke the *per se* rule against tying. In my opinion, this makes no economic sense. The holding that market power can be found on the present record causes these venerable rules of selective proscription to extend well beyond the point where the reasoning that supports them leaves off. Moreover, because the sort of power condemned by the Court today is possessed by every manufacturer of durable goods with distinctive parts, the Court's opinion threatens to release a torrent of litigation and a flood of commercial intimidation that will do much more harm than good to enforcement of the antitrust laws and to genuine competition. I shall explain, in Parts II and III, respectively, how neither logic *nor* experience suggests, let alone compels, ap-

plication of the *per se* tying prohibition and monopolization doctrine to a seller's behavior in its single-brand aftermarkets, when that seller is without power at the interbrand level.

## II

On appeal in the Ninth Circuit, respondents, having waived their "rule of reason" claim, were limited to arguing that the record, construed in the light most favorable to them, *Anderson* v. *Liberty Lobby, Inc.*, 477 U. S. 242, 255 (1986), supported application of the *per se* tying prohibition to Kodak's restrictive parts and service policy. See 903 F. 2d 612, 615, n. 1 (1990). As the Court observes, in order to survive Kodak's motion for summary judgment on this claim, respondents bore the burden of proffering evidence on which a reasonable trier of fact could conclude that Kodak possesses power in the market for the alleged "tying" product. See *ante*, at 464; *Jefferson Parish*, 466 U. S., at 13–14.

## A

We must assume, for purposes of deciding this case, that petitioner is without market, much less monopoly, power in the interbrand markets for its micrographic and photocopying equipment. See *ante*, at 465–466, n. 10; *Oklahoma City* v. *Tuttle*, 471 U. S. 808, 816 (1985). In the District Court, respondents did, in fact, include in their complaint an allegation which posited the interbrand equipment markets as the relevant markets; in particular, they alleged a § 1 "tie" of micrographic and photocopying equipment to the parts and service for those machines. App. 22–23. Though this allegation was apparently abandoned in pursuit of §§ 1 and 2 claims focused exclusively on the parts and service aftermarkets (about which more later), I think it helpful to analyze how that claim would have fared under the *per se* rule.

Had Kodak—from the date of its entry into the micrographic and photocopying equipment markets—included a lifetime parts and service warranty with all original equip-

ment, or required consumers to purchase a lifetime parts and service contract with each machine, that bundling of equipment, parts, and service would no doubt constitute a tie under the tests enunciated in *Jefferson Parish, supra.* Nevertheless, it would be immune from *per se* scrutiny under the antitrust laws because the *tying* product would be *equipment,* a market in which (we assume) Kodak has no power to influence price or quantity. See *id.,* at 13–14; *United States Steel Corp.* v. *Fortner Enterprises, Inc.,* 429 U. S. 610, 620 (1977) *(Fortner II); Northern Pacific R. Co.* v. *United States,* 356 U. S. 1, 6–7 (1958). The same result would obtain, I think, had Kodak—from the date of its market entry—consistently pursued an announced policy of limiting parts sales in the manner alleged in this case, so that customers bought with the knowledge that aftermarket support could be obtained only from Kodak. The foreclosure of respondents from the business of servicing Kodak's micrographic and photocopying machines in these illustrations would be undeniably complete—as complete as the foreclosure described in respondents' complaint. Nonetheless, we would inquire no further than to ask whether Kodak's *market power* in the equipment market effectively forced consumers to purchase Kodak micrographic or photocopying machines subject to the company's restrictive aftermarket practices. If not, that would end the case insofar as the *per se* rule was concerned. See *Jefferson Parish, supra,* at 13–14; 9 P. Areeda, Antitrust Law ¶ 1709c5, pp. 101–102 (1991); Klein & Saft, The Law and Economics of Franchise Tying Contracts, 28 J. Law & Econ. 345, 356 (1985). The evils against which the tying prohibition is directed would simply not be presented. Interbrand competition would render Kodak powerless to gain economic power over an additional class of consumers, to price discriminate by charging each customer a "system" price equal to the system's economic value to that customer, or to raise barriers to entry in the interbrand equipment markets. See 3 Areeda & Turner ¶ 829d, at 331–332.

I have described these illustrations as hypothetical, but in fact they are not far removed from this case. The record below is consistent—in large part—with just this sort of bundling of equipment on the one hand, with parts and service on the other. The restrictive parts policy, with respect to micrographic equipment at least, was not even alleged to be anything but prospective. See App. 17. As respondents summarized their factual proffer below:

> "Under this policy, Kodak cut off parts on new products to Kodak micrographics [independent service organizations] ISOs. The effect of this, of course, was that as customers of Kodak micrographics ISOs obtained new equipment, the ISOs were unable to service the equipment for that customer, and, service for these customers was lost by the Kodak ISOs. Additionally, as equipment became obsolete, and the equipment population became all "new equipment" (post April 1985 models), Kodak micrographics ISOs would be able to service no equipment at all." *Id.*, at 360.

As to Kodak copiers, Kodak's restrictive parts policy had a broader foundation: Considered in the light most favorable to respondents, see *Anderson, supra,* at 255, the record suggests that, from its inception, the policy was applied to new and existing copier customers alike. But at least all post-1985 purchasers of micrographic equipment, like all post-1985 purchasers of new Kodak copiers, could have been aware of Kodak's parts practices. The only thing lacking to bring all of these purchasers (accounting for the vast bulk of the commerce at issue here) squarely within the hypotheticals we have described is concrete evidence that the restrictive parts policy was announced or generally known. Thus, under the Court's approach the existence *vel non* of such evidence is determinative of the legal standard (the *per se* rule versus the rule of reason) under which the alleged tie is examined. In my judgment, this makes no sense. It is

quite simply anomalous that a manufacturer functioning in a competitive equipment market should be exempt from the *per se* rule when it bundles equipment with parts and service, but not when it bundles parts with service. This vast difference in the treatment of what will ordinarily be economically similar phenomena is alone enough to call today's decision into question.

### B

In the Court of Appeals, respondents sought to sidestep the impediment posed by interbrand competition to their invocation of the *per se* tying rule by zeroing in on the parts and service "aftermarkets" for Kodak equipment. By alleging a tie of *parts* to service, rather than of *equipment* to parts and service, they identified a tying product in which Kodak unquestionably held a near-monopoly share: the parts uniquely associated with Kodak's brand of machines. See *Jefferson Parish*, 466 U. S., at 17. The Court today holds that such a facial showing of market share in a single-brand aftermarket is sufficient to invoke the *per se* rule. The existence of even vibrant interbrand competition is no defense. See *ante*, at 470–471.

I find this a curious form of market power on which to premise the application of a *per se* proscription. It is enjoyed by virtually every manufacturer of durable goods requiring aftermarket support with unique, or relatively unique, goods. See P. Areeda & H. Hovenkamp, Antitrust Law ¶ 525.1, p. 563 (Supp. 1991). "[S]uch reasoning makes every maker of unique parts for its own product a holder of market power *no matter how unimportant its product might be in the market.*" *Ibid.* (emphasis added).[1] Under

---

[1] That there exist innumerable parts and service firms in such industries as the automobile industry, see Brief for Automotive Warehouse Distributors Association et al. as *Amici Curiae* 2–3, does not detract from this point. The question whether power to control an aftermarket exists is quite distinct from the question whether the power has been exercised. Manufacturers in some markets have no doubt determined that exclusion-

the Court's analysis, the *per se* rule may now be applied to single-brand ties effected by the most insignificant players in fully competitive interbrand markets, as long as the arrangement forecloses aftermarket competitors from more than a *de minimis* amount of business, *Fortner I*, 394 U. S., at 501. This seems to me quite wrong. A tying arrangement "forced" through the exercise of such power no more implicates the leveraging and price discrimination concerns behind the *per se* tying prohibition than does a tie of the foremarket brand to its aftermarket derivatives, which—as I have explained—would not be subject to *per se* condemnation.[2] As implemented, the Kodak arrangement challenged

---

ary intrabrand conduct works to their disadvantage at the competitive interbrand level, but this in no way refutes the self-evident reality that control over unique replacement parts for single-branded goods is ordinarily available to such manufacturers for the taking. It confounds sound analysis to suggest, as respondents do, see Brief for Respondents 5, 37, that the asserted fact that Kodak manufactures only 10% of its replacement parts, and purchases the rest from original equipment manufacturers, casts doubt on Kodak's possession of an inherent advantage in the aftermarkets. It does no such thing, any more than Kodak's contracting with others for the manufacture of all constituent parts included in its original equipment would alone suggest that Kodak lacks power in the *interbrand* micrographic and photocopying equipment markets. The suggestion implicit in respondents' analysis—that if a seller chooses to contract for the manufacture of its branded merchandise, it must permit the contractors to compete in the sale of that merchandise—is plainly unprecedented.

[2] Even *with* interbrand power, I may observe, it is unlikely that Kodak could have incrementally exploited its position through the tie of parts to service alleged here. Most of the "service" at issue is inherently associated with the parts, *i. e.*, that service involved in incorporating the parts into Kodak equipment, and the two items tend to be demanded by customers in fixed proportions (one part with one unit of service necessary to install the part). When that situation obtains, "'no revenue can be derived from setting a higher price for the tied product which could not have been made by setting the optimum price for the tying product.'" P. Areeda & L. Kaplow, Antitrust Analysis ¶ 426(a), p. 706 (4th ed. 1988) (quoting Bowman, Tying Arrangements and the Leverage Problem, 67 Yale L. J. 19 (1957)). These observations strongly suggest that Kodak

in this case may have implicated truth-in-advertising or other consumer protection concerns, but those concerns do not alone suggest an antitrust prohibition. See, e. g., *Town Sound and Custom Tops, Inc.* v. *Chrysler Motors Corp.*, 959 F. 2d 468 (CA3 1992) (en banc).

In the absence of interbrand power, a seller's predominant or monopoly share of its single-brand derivative markets does not connote the power to raise derivative market prices *generally* by reducing quantity. As Kodak and its principal *amicus*, the United States, point out, a rational consumer considering the purchase of Kodak equipment will inevitably factor into his purchasing decision the expected cost of after-market support. "[B]oth the price of the equipment and the price of parts and service over the life of the equipment are expenditures that are necessary to obtain copying and micrographic services." Brief for United States as *Amicus Curiae* 13. If Kodak set generally supracompetitive prices for either spare parts or repair services without making an offsetting reduction in the price of its machines, rational consumers would simply turn to Kodak's competitors for photocopying and micrographic systems. See, e. g., *Grappone, Inc.* v. *Subaru of New England, Inc.*, 858 F. 2d 792, 796–798 (CA1 1988). True, there are—as the Court notes, see *ante*, at 474–475—the occasional irrational consumers that consider only the hardware cost at the time of purchase (a category that regrettably includes the Federal Government, whose "purchasing system," we are told, assigns foremarket purchases and aftermarket purchases to different entities). But

---

parts and the service involved in installing them should not be treated as distinct products for antitrust tying purposes. See *Jefferson Parish Hospital Dist. No. 2* v. *Hyde*, 466 U. S. 2, 39 (1984) (O'CONNOR, J., concurring in judgment) ("For products to be treated as distinct, the tied product must, at a minimum, be one that some consumers might wish to purchase separately *without also purchasing the tying product*") (emphasis in original) (footnote omitted); Ross, The Single Product Issue in Antitrust Tying: A Functional Approach, 23 Emory L. J. 963, 1009–1010 (1974).

we have never before premised the application of antitrust doctrine on the lowest common denominator of consumer.

The Court attempts to counter this theoretical point with a theory of its own. It says that there are "information costs"—the costs and inconvenience to the consumer of acquiring and processing life-cycle pricing data for Kodak machines—that "could create a less responsive connection between service and parts prices and equipment sales." *Ante,* at 473. But this truism about the functioning of markets for sophisticated equipment cannot create "market power" of concern to the antitrust laws where otherwise there is none. "Information costs," or, more accurately, gaps in the availability and quality of consumer information, pervade real-world markets; and because consumers generally make do with "rough cut" judgments about price in such circumstances, in virtually any market there are zones within which otherwise competitive suppliers may overprice their products without losing appreciable market share. We have never suggested that the principal players in a market with such commonplace informational deficiencies (and, thus, bands of apparent consumer pricing indifference) exercise market power in any sense relevant to the antitrust laws. "While [such] factors may generate 'market power' in some abstract sense, they do not generate the kind of market power that justifies condemnation of tying." *Jefferson Parish,* 466 U. S., at 27; see, *e. g., Town Sound and Custom Tops, Inc.* v. *Chrysler Motors Corp., supra.*

Respondents suggest that, even if the existence of interbrand competition prevents Kodak from raising prices *generally* in its single-brand aftermarkets, there remain certain consumers who are necessarily subject to abusive Kodak pricing behavior by reason of their being "locked in" to their investments in Kodak machines. The Court agrees; indeed, it goes further by suggesting that even a *general* policy of supracompetitive aftermarket prices might be profitable over the long run because of the "lock-in" phenomenon. "[A]

seller profitably could maintain supracompetitive prices in the aftermarket," the Court explains, "if the switching costs were high relative to the increase in service prices, and the number of locked-in customers were high relative to the number of new purchasers." *Ante,* at 476. In speculating about this latter possibility, the Court is essentially repudiating the assumption on which we are bound to decide this case, viz., Kodak's lack of any power whatsoever in the interbrand market. If Kodak's *general* increase in aftermarket prices were to bring the total "system" price above competitive levels in the interbrand market, Kodak would be wholly unable to make further foremarket sales—and would find itself exploiting an ever-dwindling aftermarket, as those Kodak micrographic and photocopying machines already in circulation passed into disuse.

The Court's narrower point, however, is undeniably true. There will be consumers who, because of their capital investment in Kodak equipment, "will tolerate some level of service-price increases before changing equipment brands," *ibid.;* this is *necessarily* true for "every maker of unique parts for its own product." Areeda & Hovenkamp, Antitrust Law ¶ 525.1b, at 563. But this "circumstantial" leverage created by consumer investment regularly crops up in smoothly functioning, even perfectly competitive, markets, and in most—if not all—of its manifestations, it is of no concern to the antitrust laws. The leverage held by the manufacturer of a malfunctioning refrigerator (which is measured by the consumer's reluctance to walk away from his initial investment in that device) is no different in kind or degree from the leverage held by the swimming pool contractor when he discovers a 5-ton boulder in his customer's backyard and demands an additional sum of money to remove it; or the leverage held by an airplane manufacturer over an airline that has "standardized" its fleet around the manufacturer's models; or the leverage held by a drill press manufacturer whose customers have built their production lines around the

manufacturer's particular style of drill press; or the leverage held by an insurance company over its independent sales force that has invested in company-specific paraphernalia; or the leverage held by a mobile home park owner over his tenants, who are unable to transfer their homes to a different park except at great expense, see generally *Yee* v. *Escondido,* 503 U. S. 519 (1992). Leverage, in the form of *circumstantial* power, plays a role in each of these relationships; but in none of them is the leverage attributable to the dominant party's *market* power in any relevant sense. Though that power can plainly work to the injury of certain consumers, it produces only "a brief perturbation in competitive conditions—not the sort of thing the antitrust laws do or should worry about." *Parts & Elec. Motors, Inc.* v. *Sterling Elec., Inc.,* 866 F. 2d 228, 236 (CA7 1988) (Posner, J., dissenting).

The Court correctly observes that the antitrust laws do not permit even a *natural* monopolist to project its monopoly power into another market, *i. e.,* to " 'exploi[t] his dominant position in one market to expand his empire into the next.' " *Ante,* at 480, n. 29 (quoting *Times-Picayune Publishing Co.* v. *United States,* 345 U. S. 594, 611 (1953)). However, when a manufacturer uses its control over single-branded parts to acquire influence in single-branded service, the monopoly "leverage" is almost invariably of no practical consequence, because of perfect identity between the consumers in each of the subject aftermarkets (those who need replacement parts for Kodak equipment and those who need servicing of Kodak equipment). When that condition exists, the tie does not permit the manufacturer to project power over a class of consumers distinct from that which it is already able to exploit (and fully) without the inconvenience of the tie. Cf., *e. g.,* Bowman, Tying Arrangements and the Leverage Problem, 67 Yale L. J. 19, 21–27 (1957).

We have never before accepted the thesis the Court today embraces: that a seller's inherent control over the unique

parts for its own brand amounts to "market power" of a character sufficient to permit invocation of the *per se* rule against tying. As the Court observes, *ante,* at 479–481, n. 29, we have applied the *per se* rule to manufacturer ties of *foremarket* equipment to aftermarket derivatives—but only when the manufacturer's monopoly power in the equipment, coupled with the use of derivative sales as "counting devices" to measure the intensity of customer equipment usage, enabled the manufacturer to engage in price discrimination, and thereby more fully exploit its interbrand power. See *International Salt Co.* v. *United States,* 332 U. S. 392 (1947); *International Business Machines Corp.* v. *United States,* 298 U. S. 131 (1936); *United Shoe Machinery Corp.* v. *United States,* 258 U. S. 451 (1922). That sort of enduring opportunity to engage in price discrimination is unavailable to a manufacturer—like Kodak—that lacks power at the interbrand level. A tie between two aftermarket derivatives does next to nothing to improve a competitive manufacturer's ability to extract monopoly rents from its consumers.[3]

---

[3] The Court insists that the record in this case suggests otherwise, *i. e.,* that a tie between parts and service somehow *does* enable Kodak to increase overall monopoly profits. See *ante,* at 479–481, n. 29. Although the Court does not identify the record evidence on which it relies, the suggestion, apparently, is that such a tie facilitates price discrimination between sophisticated, "high-volume" users of Kodak equipment and their unsophisticated counterparts. The sophisticated users (who, the Court presumes, invariably self-service their equipment) are permitted to buy Kodak parts without also purchasing supracompetitively priced Kodak service, while the unsophisticated are—through the imposition of the tie—compelled to buy both. See *ante,* at 475–476.

While superficially appealing, at bottom this explanation lacks coherence. Whether they self-service their equipment or not, rational foremarket consumers (those consumers who are not yet "locked in" to Kodak hardware) will be driven to Kodak's competitors if the price of Kodak equipment, together with the expected cost of aftermarket support, exceeds competitive levels. This will be true no matter how Kodak distributes the total system price among equipment, parts, and service. See

Nor has any court of appeals (save for the Ninth Circuit panel below) recognized single-branded aftermarket power as a basis for invoking the *per se* tying prohibition. See *Virtual Maintenance, Inc.* v. *Prime Computer, Inc.*, 957 F. 2d 1318, 1328 (CA6 1992) ("Defining the market by customer demand *after* the customer has chosen a single supplier fails to take into account that the supplier . . . must compete with other similar suppliers to be designated the

---

*supra*, at 495. Thus, as to these consumers, Kodak's lack of interbrand power wholly prevents it from employing a tie between parts and service as a vehicle for price discrimination. Nor does a tie between parts and service offer Kodak incremental exploitative power over those consumers—sophisticated or not—who have the supposed misfortune of being "locked in" to Kodak equipment. If Kodak desired to exploit its circumstantial power over this wretched class by pressing them up to the point where the cost to each consumer of switching equipment brands barely exceeded the cost of retaining Kodak equipment and remaining subject to Kodak's abusive practices, it could plainly do so without the inconvenience of a tie, through supracompetitive parts pricing alone. Since the locked-in *sophisticated* parts purchaser is as helpless as the locked-in *unsophisticated* one, I see nothing to be gained by price discrimination in favor of the former. If such price discrimination were desired, however, it would not have to be accomplished indirectly, through a tie of parts to service. Section 2(a) of the Robinson-Patman Act, 15 U. S. C. § 13(a), would prevent giving lower parts prices to the sophisticated customers only "where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them . . . ." *Ibid.;* see, *e. g., Falls City Industries, Inc.* v. *Vanco Beverage, Inc.*, 460 U. S. 428, 434–435 (1983). That prohibited effect often occurs when price-discriminated goods are sold for resale (*i. e.*, to purchasers who are necessarily in competition with one another). *E. g., FTC* v. *Morton Salt Co.*, 334 U. S. 37, 47 (1948); see P. Areeda & L. Kaplow, Antitrust Analysis ¶ 600, p. 923 (1988) ("Secondary-line injury arises [under the Robinson-Patman Act] when a powerful firm buying supplies at favorable prices thereby gains a decisive advantage over its competitors that are forced to pay higher prices for their supplies"). It rarely occurs where, as would be the case here, the price-discriminated goods are sold to various businesses for consumption.

sole source in the first place"); *Grappone, Inc.* v. *Subaru of New England, Inc.*, 858 F. 2d, at 798 ("[W]e do not see how such dealer investment [in facilities to sell Subaru products] . . . could easily translate into Subaru market power of a kind that, through tying, could ultimately lead to higher than competitive prices for consumers"); *A. I. Root Co.* v. *Computer/Dynamics, Inc.*, 806 F. 2d 673, 675–677, and n. 3 (CA6 1986) (competition at "small business computer" level precluded assertion of computer manufacturer's power over software designed for use only with manufacturer's brand of computer); *General Business Systems* v. *North American Philips Corp.*, 699 F. 2d 965, 977 (CA9 1983) ("To have attempted to impose significant pressure to buy [aftermarket hardware] by use of the tying service only would have hastened the date on which Philips surrendered to its competitors in the small business computer market"). See also *Parts & Elec. Motors, Inc.* v. *Sterling Elec., Inc.*, 866 F. 2d, at 233 (law-of-the-case doctrine compelled finding of market power in replacement parts for single-brand engine).

We have recognized in closely related contexts that the deterrent effect of *inter*brand competition on the exploitation of *intra*brand market power should make courts exceedingly reluctant to apply rules of *per se* illegality to intrabrand restraints. For instance, we have refused to apply a rule of *per se* illegality to vertical nonprice restraints "because of their potential for a simultaneous reduction of intrabrand competition and stimulation of interbrand competition," *Continental T. V., Inc.* v. *GTE Sylvania Inc.*, 433 U. S. 36, 51–52 (1977), the latter of which we described as "the primary concern of antitrust law," *id.*, at 52, n. 19. We noted, for instance, that "new manufacturers and manufacturers entering new markets can use the restrictions in order to induce competent and aggressive retailers to make the kind of investment of capital and labor that is often required in the distribution of products unknown to the consumer," and that "[e]stablished manufacturers can use them

to induce retailers to engage in promotional activities or to provide service and repair facilities necessary to the efficient marketing of their products." *Id.*, at 55. See also *Business Electronics Corp.* v. *Sharp Electronics Corp.*, 485 U. S. 717, 726 (1988). The same assumptions, in my opinion, should govern our analysis of ties alleged to have been "forced" solely through *intra*brand market power. In the absence of interbrand power, a manufacturer's bundling of aftermarket products may serve a multitude of legitimate purposes: It may facilitate manufacturer efforts to ensure that the equipment remains operable and thus protect the seller's business reputation, see *United States* v. *Jerrold Electronics Corp.*, 187 F. Supp., at 560; it may create the conditions for implicit consumer financing of the acquisition cost of the tying equipment through supracompetitively-priced aftermarket purchases, see, *e. g.*, A. Oxenfeldt, Industrial Pricing and Market Practices 378 (1951); and it may, through the resultant manufacturer control of aftermarket activity, "yield valuable information about component or design weaknesses that will materially contribute to product improvement," 3 Areeda & Turner ¶ 733c, at 258–259; see also *id.*, ¶ 829d, at 331–332. Because the interbrand market will generally punish intrabrand restraints that consumers do not find in their interest, we should not—under the guise of a *per se* rule—condemn such potentially procompetitive arrangements simply because of the antitrust defendant's inherent power over the unique parts for its own brand.

I would instead evaluate the aftermarket tie alleged in this case under the rule of reason, where the tie's *actual* anticompetitive effect in the tied product market, together with its potential economic benefits, can be fully captured in the analysis, see, *e. g.*, *Jefferson Parish*, 466 U. S., at 41 (O'CONNOR, J., concurring in judgment). Disposition of this case does not require such an examination, however, as respondents apparently waived any rule-of-reason claim they

may have had in the District Court. I would thus reverse the Ninth Circuit's judgment on the tying claim outright.

## III

These considerations apply equally to respondents' § 2 claims. An antitrust defendant lacking relevant "market power" sufficient to permit invocation of the *per se* prohibition against tying *a fortiori* lacks the monopoly power that warrants heightened scrutiny of his allegedly exclusionary behavior. Without even so much as asking whether the purposes of § 2 are implicated here, the Court points to Kodak's control of "100% of the parts market and 80% to 95% of the service market," markets with "no readily available substitutes," *ante*, at 481, and finds that the proffer of such statistics is sufficient to fend off summary judgment. But this showing could easily be made, as I have explained, with respect to virtually any manufacturer of differentiated products requiring aftermarket support. By permitting antitrust plaintiffs to invoke § 2 simply upon the unexceptional demonstration that a manufacturer controls the supplies of its single-branded merchandise, the Court transforms § 2 from a specialized mechanism for responding to extraordinary agglomerations (or threatened agglomerations) of economic power to an all-purpose remedy against run-of-the-mill business torts.

In my view, if the interbrand market is vibrant, it is simply not necessary to enlist § 2's machinery to police a seller's intrabrand restraints. In such circumstances, the interbrand market functions as an infinitely more efficient and more precise corrective to such behavior, rewarding the seller whose intrabrand restraints enhance consumer welfare while punishing the seller whose control of the aftermarkets is viewed unfavorably by interbrand consumers. See *Business Electronics Corp., supra*, at 725; *Continental T. V., Inc., supra*, at 52, n. 19, 54. Because this case comes to us on the as-

sumption that Kodak is without such interbrand power, I believe we are compelled to reverse the judgment of the Court of Appeals.  I respectfully dissent.