**CALDERA, INC., Plaintiff,**

v.

**MICROSOFT CORPORATION, Defendant.**

**No. 2:96–CV–645 B.**

United States District Court,
D. Utah,
Central Division.

June 28, 1999.

Stephen J. Hill, Ryan E. Tibbitts, Max D. Wheeler, Snow Christensen & Martineau, Salt Lake City, UT, Stephen D. Susman, Charles R. Eskridge, III, James T. Southwick, Susman Godfrey LLP, Houston, TX, Parker C. Folse, III, Susman Godfrey LLP, Seattle, WA, Ralph H. Palumbo, Lynn M. Engel, Philip S. McCune, Lawrence C. Locker, Summit Law Group, Seattle, WA, for plaintiff.

Michael P. O'Brien, Jones Waldo Holbrook & McDonough, Salt Lake City, UT, for Salt Lake Tribune, movant.

James S. Jardine, Steven J. Aeschbacjer, Mark M. Bettilyon, John W. Mackay, Valerie A. Longmire, Mark W. Pugsley, Ray Quinney & Nebeker, Salt Lake City, UT, Richard J. Urowsky, Steven L. Holley, Richard C. Pepperman, II, Jay Holtmeier, Richard H. Klapper, Sullivan &

Cromwell, New York City, William H. Neukom, Thomas W. Burt, David A. Heiner, Redmond, VA, James R. Weiss, Preston Gates Ellis & Rouvelas Meeds, Washington, DC, Michael H. Steinberb, Michael Tenenbaum, Brendan P. Cullen, Sullivan & Cromwell, Los Angeles, CA, for defendant.

Clark Waddoups, Parr, Waddoups Brown Gee & Loveless, Salt Lake City, UT, Robert G. Loewy, Omelveny & Myers, Newport Beach, CA, for Bristol Technology, movant.

Michael P. O'Brien, Jones Waldo Holbrook & McDonough, Salt Lake City, UT, James Chadwick, Edward P. Davis, Jr., Gary Cary Ware & Fridenrich, Palo Alto, CA, for San Jose Mercury News, movant.

Gary F. Bendinger, Joy E. Onton, Giauque Crockett Bendinger & Peterson, Salt Lake City, UT, Richard L. Klein, Marcia T. Maack, Willkie Farr & Gallagher, New York City, for Bloomberg L.P., movant.

## MEMORANDUM OPINION and ORDER

BENSON, Chief Judge.

### I. Introduction

This case concerns two manufacturers of operating systems for personal computers, plaintiff Caldera, Inc. and defendant Microsoft Corporation. Caldera alleges and Microsoft does not dispute for purposes of the instant motions, that by the mid–1980's Microsoft had monopoly control of the relevant market for computer operating systems with its product MS DOS. In an effort to compete with MS DOS, Digital Research Inc. (DRI) developed its own computer operating system known as DR DOS.[1] Caldera alleges that because DR DOS was superior to MS DOS and posed a threat to Microsoft's operating systems, Microsoft engaged in anticompetitive conduct in violation of Sections 1 and 2 of the Sherman Antitrust Act.[2] Among the predatory behavior alleged, Caldera complains of the following conduct related to the three motions currently before the Court: (1) Microsoft prematurely and falsely announced to the public plans to release an improved MS DOS product (MS DOS 5.0) at the same time DR DOS was gaining significant market acceptance—Caldera contends this was done with the intent to forestall computer manufacturers from buying DR DOS and with the knowledge that MS DOS 5.0 was not forthcoming as represented; (2) Microsoft improperly engaged in a campaign of disseminating information in the computer industry to create fear, uncertainty and doubt about the effectiveness of DR DOS and its compatibility with "Windows," Microsoft's popular graphical user interface (GUI) program; and (3) Microsoft employed licensing agreements relating to MS DOS among computer manufacturers that were designed to prevent the manufacturers from purchasing DR DOS by offering significant discounts to computer manufacturers who elected to enter into agreements that required them to pay a royalty to Microsoft on every computer sold, irrespective of whether MS DOS or another operating system was actually installed on the computer.

In response to these allegations Microsoft has moved for partial summary judgment on "Plaintiff's Product Preannouncement Claims," "Plaintiff's Product Disparagement ("FUD") Claims," and "Plaintiff's Claims Regarding Microsoft's Licensing Practices." The Court heard

---

1. In 1991 DRI merged with Novell Corporation. In 1996 Caldera acquired DR DOS and the right to pursue any claim DRI/Novell may have against Microsoft Corporation.

2. Section 1 of the Sherman Act prohibits restraints on trade. It states in relevant part: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." 15 U.S.C. § 1. Section 2 of the Sherman Act makes guilty of a felony "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2.

oral argument on these motions on May 25, 1999 and May 27, 1999. After considering the written briefs and oral arguments of the parties, the Court denies defendant's motion for the following reasons.

## II. Standard of Review

Summary judgment is proper if the moving party can demonstrate that there is no genuine issue of material fact, and, therefore, is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c). The court is required to construe all facts and reasonable inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Wright v. Southwestern Bell Tel. Co.,* 925 F.2d 1288, 1292 (10th Cir.1991). In considering whether there exist genuine issues of material fact, the court determines whether a reasonable jury could return a verdict for the nonmoving party in the face of all the evidence presented. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Clifton v. Craig,* 924 F.2d 182, 183 (10th Cir.1991).

## III. Motions for Partial Summary Judgment

In order to establish a violation of Section 2 of the Sherman Antitrust Act, a plaintiff must establish that (1) the defendant possessed monopoly power in the relevant market and (2) the defendant willfully acquired or maintained that monopoly power through anticompetitive means "as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 480, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (quoting *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966)). Because Microsoft does not contest, for purposes of the instant motions, that it has monopoly power in the relevant market, the following motions address only whether Microsoft willfully maintained its monopoly power through anticompetitive means.

### A. Product Preannouncement

Caldera asserts that in an attempt to insulate its monopoly position in the DOS market, Microsoft engaged in a pattern of anticompetitive conduct by: (1) preannouncing a new version of MS DOS shortly after DRI announced a new version of DR DOS; (2) announcing a false release date for MS DOS 5.0 to curtail DOS users from buying DR DOS; (3) studying the new DR DOS version in order to add its improved features to the promised MS DOS version; and (4) moving MS DOS's release date back in small increments to keep MS DOS users awaiting the promised new MS DOS version, rather than purchasing DR DOS. Caldera points to several statements made to the public by Microsoft representatives that Microsoft would be releasing MS DOS 5.0 as early as September of 1990.[3] Caldera further contends that Microsoft knew it was impossible to release MS DOS 5.0 by the proposed date. MS DOS 5.0 was in fact not released until June of 1991.

In response to Caldera's allegations that Microsoft improperly preannounced its plans to release MS–DOS 5.0, Microsoft argues that in order succeed on a product preannouncement claim Caldera must show that the announcements made by Microsoft were "knowingly false or misleading." *See MCI Communications Corp. v. AT & T,* 708 F.2d 1081 (7th Cir. 1983) (finding that in order to succeed on a product preannouncement claim, a plaintiff must demonstrate that statements were knowingly false or misleading). However, much of Caldera's evidence centers around the fact that the Microsoft release dates

---

**3.** Specifically, Caldera points to the following public statements: statements made by Microsoft representatives to three computer trade magazines in late April of 1990, statements made by Microsoft representatives to original equipment manufacturers (OEM) in May of 1990, and statements made by Microsoft representatives to a reporter in June of 1990,

were objectively unreasonable rather knowingly false and that Microsoft was aware of the unreasonableness of their projected release dates for MS DOS 5.0, 6.0, and 7.0. Caldera submits a report from its own expert as well as deposition testimony from Microsoft management personnel stating that the scheduled release dates for MS DOS were unrealistic or impossible to meet. Microsoft complains that Caldera is asking the Court to abandon the test applied in *MCI* and its progeny (requiring that a preannouncement statement must be either knowingly false or misleading) and adopt a more relaxed standard requiring only a showing that statements relating to product preannouncement were not made in good faith or otherwise were objectively unreasonable.

■ The Court agrees as a general proposition that the question of reasonableness may not be the appropriate standard to determine whether product preannouncement is anticompetitive under Section 2, especially in a case where product preannouncement is the sole basis for the claim. However, regardless of the standard, an inquiry into reasonableness will most likely be relevant to assessing whether a statement was knowingly false or misleading. Proving state of mind is a difficult task. Rare indeed is the case where a plaintiff has direct evidence that a defendant knew he or she was making a false statement at the time they were preannouncing a product. Often whether a monopolist acted knowingly will be based on circumstantial evidence. It is appropriate that the reasonableness of the statement be considered. Had the product manager of MS DOS 5.0 announced that the product would be released the following week and it was subsequently discovered that there were not even specifications in existence at the time the statement was made, a logical inference could be drawn that the statement was knowingly false.

Caldera offers internal Microsoft documents in support of its allegations that Microsoft made false statements about the release date for MS DOS 5.0. In a Microsoft document entitled "DR DOS 5.0 Competitive Analysis" dated May 3, 1990, the document states, "On the PR side, we have begun an 'aggressive leak' campaign for MS–DOS 5.0. The goal is to build anticipation for MS–DOS 5.0 and diffuse potential excitement/momentum from the DR DOS 5.0 announcement." (Caldera Exhibit 49). Caldera asserts that the aggressive leak campaign consisted of disseminating information in the computer industry that MS DOS was forthcoming, when in fact it was not.

As further evidence that Microsoft knew that the preannounced dates could not be met, Caldera cites to the minutes from a program management meeting attended by top Microsoft executives titled "Windows 3.0 Post Mortem." Under the heading "Schedule" the following language is found:

* Set by BillG (upper management) before feature definitions are outlined.

* Problem motivating people to achieve "fake" ship dates.

* Need to be more realistic in our schedules.

* Lying to people on the team about schedules. Morale hit to the team.

* How to separate out development schedules and the schedules we give to other groups (USSMD or upper management) without appearing to "lie" to the product team.

(Caldera Exhibit 47).

Based on these documents and evidence that the publicly stated release dates for MS DOS were objectively unreasonable, a genuine question of fact has been raised as to whether Microsoft made knowingly false statements, or otherwise engaged in anticompetitive behavior with respect to its "product preannouncement" practices concerning the release of MS DOS. Such a question is appropriately considered by a fact-finder and is inappropriate for summary judgment. Having found that a ma-

terial issue of fact exists as to whether Microsoft's statements were knowingly false, the court need not determine with finality at this point of the proceedings whether *MCI*'s standard is controlling in this case. Caldera contends the *MCI* standard is not applicable here where its product preannouncement allegations against Microsoft are only part of a larger picture. This issue will be more fully explored by the Court in connection with Caldera's motion to strike and, of course, in the formulation of appropriate instructions to the jury. Defendant's motion for summary judgment on product preannouncement is denied.

## B. Product Disparagement

■ Caldera also alleges that Microsoft engaged in a campaign of spreading fear, uncertainty and doubt (FUD) to create the perception that DR DOS and Windows were incompatible. Caldera alleges that Microsoft employed a variety of tactics to this end. Among other allegedly predatory conduct complained of, Caldera contends that: (1) Microsoft made false statements to computer makers about the compatibility of the two products; (2) Microsoft blacklisted DRI from participating in the Windows 3.1 beta program and then took advantage of resulting incompatibilities between DR DOS and Windows by blaming them on DR DOS; (3) Microsoft included code in Windows 3.1 during the beta program that was designed solely to display a false error message if a user tried to run Windows 3.1 on any operating system other than MS DOS; (4) Microsoft introduced "bugs" in Windows 3.1 that caused fatal errors when users tried to use Windows on DR DOS; and (5) Microsoft included code in Windows 3.1 that prevented DR DOS from running with Windows. Caldera contends that this and other anticompetitive behavior was in violation of Section 2 of the Sherman Antitrust Act.

In response, Microsoft has moved for partial summary judgment on Caldera's "Product Disparagement" claim relating to the false statements allegedly made by Microsoft. Microsoft asserts that in order to succeed on a product disparagement claim Caldera must demonstrate that the statements made by Microsoft about DR DOS were "(1) clearly false, (2) clearly material, (3) clearly likely to induce reasonable reliance, (4) made to consumers having little understanding of the subject matter, (5) continued for an extended time period, and (6) not readily susceptible to counter statement, explanation or other neutralizing effort or offset by the plaintiff." *David L. Aldridge Co. v. Microsoft Corp.*, 995 F.Supp. 728, 749 (S.D.Tex.1998).

However, unlike the plaintiff in *David L. Aldridge Co.*, Caldera has not alleged libel or business disparagement. Rather, as explained above, Caldera takes a broad approach to its Section 2 claim, arguing that based on an examination of all the predatory conduct Microsoft engaged in, Microsoft violated antitrust law. The misleading statements may not amount to a finding of Section 2 liability standing alone, but Caldera has not alleged a separate product disparagement claim. The statements viewed with other behavior may, however, support a Section 2 violation, as Caldera has alleged. Therefore, summary judgment on product disparagement is denied.

It is important to note that the denial of summary judgment on this claim does not necessarily allow for the admission of all the evidence presented by Caldera relating to Microsoft's motion for summary judgment on product disparagement. Questions as to the admissibility of specific evidence will be addressed as they arise.

## C. Licensing Practices

Caldera also alleges that Microsoft's two and three-year per processor licensing agreements with minimum commitments provisions were anticompetitive and unlawful under antitrust laws. Under these agreements an original equipment manufacturer (OEM) was required to pay Microsoft a royalty on every machine the OEM shipped regardless of whether the machine contained MS DOS or another

operating system. The effect of such an arrangement was that an OEM who chose to install DR DOS would pay two royalties on the same machine. Moreover, Caldera asserts that Microsoft required OEMs to make large minimum commitments with up-front payments and that Microsoft's pricing structure rewarded OEMs that made overly-optimistic minimum commitments. Accordingly, OEMs regularly had large prepaid balances when the licenses expired. OEMs would forfeit these balances unless they renewed their licenses with Microsoft. Although Microsoft offered other licensing agreements, Caldera claims that Microsoft coerced OEMs into entering per-processor licenses by offering significant discounts on MS DOS licensed under a per processor agreement. Caldera contends that this conduct was anticompetitive and therefore in violation of both Sections 1 and 2 of the Sherman Antitrust Act.[4]

 Ordinarily, the Rule of Reason is employed to determine whether particular concerted action violates Section 1 of the Sherman Act. That is, "the fact finder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 49, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). Here, the alleged facts that OEMs entered into per processor licensing agreements with Microsoft at Microsoft's suggestion and that Microsoft used economic pressure to give OEMs an incentive to enter into per processing agreements is enough evidence of restraint of trade to allow Caldera to proceed on its Section 1 claim. Therefore, the Court denies Microsoft's motion for summary judgment on Caldera's Section 1 claims relating to licensing practices.

 Turning to the strength of Caldera's Section 2 claim, the parties agree that the standard for determining whether Microsoft's licensing agreements constitute illegal exclusive dealings was established in *Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961). In *Tampa Electric* the United States Supreme Court addressed the validity of a requirements contract under the Clayton Act. In evaluating whether an exclusive dealing arrangement violates antitrust law, the Court developed a two-part test: first, the agreement at issue must be exclusive; and second, the agreement must have an adverse effect on competition. *Id.* at 329, 81 S.Ct. 623.

Microsoft argues because per processor agreements did not require an OEM covered by such an agreement to purchase all operating systems from Microsoft it is not an exclusive agreement and Caldera cannot meet the first prong of the *Tampa Electric* test. However, a contract need not be denominated exclusive nor must exclusivity be an express condition of a contract, in order for it to be exclusive under Section 2. An agreement with the "practical effect" of exclusivity is covered. *Tampa Electric,* 365 U.S. at 327, 81 S.Ct. 623 (quoting *United Shoe Machinery Corp. v. United States,* 258 U.S. 451, 457, 42 S.Ct. 363, 66 L.Ed. 708 (1922)). The effect of per processor licenses was that an OEM had to pay two royalties on a computer shipped with an operating system other than MS DOS. A fact-finder could reasonably conclude that this effect coupled with the significant discount offered OEMs who participated in per processor agreements resulted in an agreement with the practical effect of exclusivity.

Microsoft also contends that because new OEMs were always entering the market and a certain number of MS DOS licenses were expiring at any given time,

4. Microsoft also offered "per copy" licenses which obligated an OEM to pay Microsoft a royalty on every computer shipped with a copy of MS DOS installed on a computer and "per system" licenses which required an OEM that wished to install a Microsoft operating system on computers that bore a particular model designation to pay Microsoft a royalty on every computer shipped that bore that designation.

competition was not foreclosed. However, determining whether competition has been foreclosed in a given market requires first, defining the product market, and second, identifying the geographic market "by careful selection of the market area in which the seller operates, and to which the purchaser can practicably turn for supplies." *Id.* at 328, 81 S.Ct. 623. Moreover, "the competition foreclosed by the contract must be found to constitute a substantial share of the relevant market. That is to say, the opportunities for other traders to enter into or remain in that market must be significantly limited." *Id.*

The Supreme Court further stated in *Tampa Electric* that "[t]o determine whether competition has been significantly limited 'it is necessary to weigh the probable effect of the contract on the relevant area of effective competition, taking into account the relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area, and the probable immediate and future effects which preemption of that share of the market might have on effective competition therein.'" Applying this to the instant case, Microsoft has not defined the relevant market or properly weighed the factors outlined in *Tampa Electric* to determine whether per processor licenses had a substantial effect on competition. Therefore, Microsoft has not met its burden on this issue for purposes of summary judgment.

Finally, unlike the plaintiff in *Tampa Electric,* Caldera offers Microsoft's licensing scheme as part of a bigger picture of anticompetitive behavior by Microsoft. It is not a discrete claim of exclusive dealing. Microsoft's per processor agreements may not amount to a finding of Section 2 liability standing alone, however, use of per processor licenses viewed in context with other alleged anticompetitive behavior may give rise to a Section 2 violation as complained of by Caldera. Therefore, summary judgment on Microsoft's licensing practices is denied.

## IV. Conclusion

Based on the foregoing, defendant's motions for partial summary judgment on "Product Preannouncement," "Product Disparagement," and "Licensing Practices" are DENIED.