**Mark CARNAHAN, Plaintiff**

v.

**Mitch McCLURE, et al., Defendants.**

Case No. 3:12CV775.

United States District Court,
N.D. Ohio,
Western Division.

Signed June 11, 2014.

Thomas A. Sobecki, Toledo, OH, for Plaintiff.

David H. Williams, Defiance, OH, Suzanne F. Jucaitis, Law Office of William P. Lang, William P. Lang, Cleveland, OH, for Defendants.

## ORDER

JAMES G. CARR, District Judge.

This is a § 1983 case in which plaintiff Mark Carnahan claims several Defiance, Ohio, police officers used excessive force while arresting him after they reported to a dwelling in response to a domestic violence call. Defendants are Defiance Police Officers Mitch McClure, Alex Naton, James Wellman, Steve Waldron, and John Doe 1; Defiance Chief of Police Timothy Tobias; and the City of Defiance.

Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1343.

Pending is defendants' motion for summary judgment (Doc. 48).

For the reasons that follow, I grant defendants' motion.

### Background

On April 6, 2011, at 5 A.M., Betty Huston called the Defiance Police Department, reporting someone was repeatedly banging on her door and someone had slashed the tires of her car. Officers McClure, Naton, and Wellman arrived at the residence but did not find the person responsible for the banging or slashed tires.

An hour and a half later, Cynthia Huston, the sixteen year-old daughter of Betty Huston, called 911, reporting that her mother's boyfriend, the plaintiff, was on top of her mother and was choking her. Officer McClure heard the call from dispatch and recognized that it was from the same location to which he responded earlier. He went to the Huston residence but did not find the man. Officer McClure heard neighbors yell that a man had run into the woods nearby.

Defendants state that Office McClure ran towards the woods and saw a man, Derrek Sharp, struggling on the ground with plaintiff. Office McClure then acti-

vated the automatic door opener of his police cruiser to release a police dog and instructed Sharp to step away from Carnahan. Sharp did so and Carnahan stood up.

Officer McClure then grabbed Carnahan, telling him he was under arrest. Defendants allege that at this point, Carnahan became violent and repeatedly punched Officer McClure. They both fell to the ground. Officer McClure was unable to subdue Carnahan and when he tried to radio for help, Carnahan yanked the cord of the officer's microphone.

Defendants also state that Carnahan grabbed Officer McClure's gun with both hands and was able to slide the gun and holster from the side of the officer's pants to the front of his body. Officer McClure tried reaching for the gun with one hand while hitting Carnahan in the face with the other.

Defendants allege that Officer Naton then arrived and, seeing the altercation, ordered Carnahan to release the gun and put his hands behind his back or else he would be tased. Officer Naton tased Carnahan multiple times but it had no effect on him. Officer Wellman then arrived and joined the fray. After repeated strikes, taser blasts, and bites from the police dog, the three officers pried Carnahan's grip from Officer McClure's gun and handcuffed and subdued him. Defendants allege that Carnahan was under the influence of drugs which gave him extra-strength while resisting the officers.

Sergeant Waldron arrived after the officers handcuffed Carnahan and helped Officer Wellman hold him down on the grass. Three deputies from the Defiance County Sheriff's Office also responded and witnessed the brawl.

Emergency medical technicians arrived and treated the officers and tried to treat the plaintiff. Defendants state that plaintiff continued to struggle even though he was handcuffed and strapped to a gurney. Defendants allege that at the emergency room, plaintiff was combative and refused to cooperate with medical personnel.

On examining the plaintiff in the emergency room, Dr. Pribis, according to her report, observed that plaintiff's right eye showed some swelling and he had a laceration involving his eyebrow that was not actively bleeding. (Doc. 48–10, at 9). Plaintiff had no other signs of facial trauma except for dried blood in his nostrils and on his lip. His neck, lungs, heart, and abdomen all appeared normal. *Id.* at 9–10. He appeared to have no upper extremity trauma and his only complaint were the handcuffs. The doctor removed a taser barb from his stomach without any bleeding. *Id.* at 10. The doctor discharged him in stable condition.

Officers McClure, Naton, and Wellman completed Use of Force Reports as is standard in arrests where police use force. Defiance Police Chief Timothy Tobias reviewed the reports and determined the actions of the officers conformed to policies and procedures of the Defiance Police Department.

Plaintiff was indicted and pled guilty to aggravated burglary and pled no contest to, and was found guilty of, aggravated robbery, felonious assault on a peace officer, and two counts of assault on a peace officer.

In opposition to the testimony of the officers, the plaintiff submits testimony of several eyewitnesses that describes the incident differently.

Derrick Sharp, who is smaller than Carnahan, testified that he had subdued Carnahan by tackling and getting on top of him. But he lost control when he got off Carnahan because the police dog started biting him.

George Adkins expressed the view that all the police "had to do was come over there while Derik had him down and be done with it." (Doc. 50, at 13). Adkins testified that the officers were beating Carnahan up "pretty severely" and "totally waling [sic] on him and hitting him while they were tasing him." (Doc. 51, at 26–27). Sharp testified that the officers were kicking and punching Carnahan, including multiple punches to the head. (Doc. 50, at 8–9).

Betty Huston provided a sworn statement that the police officers, not Carnahan, were the aggressors and she never saw Carnahan fighting them. (Doc. 53–1, at 23). Betty Huston was also of the opinion that Carnahan is not strong enough to take on multiple trained police officers. (Doc. 53–1, at 16). Carnahan states that he screamed when the officers tased him and all three officers were repeatedly punching and kicking him. He alleges that most of the force was directed towards his upper body and face.

Both Sharp and Cynthia Huston testified that Carnahan looked "unconscious" and "lifeless" by the time he was subdued and EMS put him on a stretcher. (Doc. 50, at 23; Doc 52, at 37).

Sharp acknowledged, however, that once Carnahan stopped trying to get away, the police stopped taking action against him. (Doc. 51, at 34).

The plaintiff and his witnesses provided evidence that indicated, as the officers contend, plaintiff was under the influence of some substance or substances that affected his behavior. Plaintiff admits that he had taken two Klonopin, an anxiety medication. Betty Huston testified that she smelled alcohol on Carnahan's breath. (Doc. 53, at 20). Sharp also stated to Officer McClure that Betty told him that Carnahan was drunk that day. (Doc. 48–1, at 52). Finally, Adkins testified that "Mark [Carnahan] was on some type of drugs . . . He had to have been the way he was acting, the way he was presenting himself, the way he was slurring his words." (Doc. 50, at 26).

Plaintiff contends that all the deposed witnesses—Sharp, Adkins, and Betty and Cynthia Huston—testified that Carnahan never grabbed onto an officer's gun and that none of the officers yelled anything about Carnahan grabbing a gun.

Plaintiff himself, in contrast, testified during his deposition that, as an officer was pushing him, he grabbed onto something "and it seems as though it was a gun." (Doc. 64, at 5). He testified that he did not know exactly what it was at the time but "I pulled it back towards me, so—because, I mean, it just, to get some leverage to push this guy off of me." Id. at 7–8. He also stated that one of the officers yelled, "He tried to get my, get my gun or something." Id. at 11.

Plaintiff has now sued the police officers under 42 U.S.C. § 1983, alleging use of excessive force and state law claims of assault and battery. Plaintiff also sued Police Chief Tobias and the City of Defiance for failure to properly train, supervise, and control defendants and for developing and maintaining polices or customs exhibiting deliberate indifference to the constitutional rights of persons in Defiance.

### Standard of Review

A party is entitled to summary judgment on motion under Fed.R.Civ.P. 56 where the opposing party fails to show the existence of an essential element for which that party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The movant must initially show the absence of a genuine issue of material fact. *Id.* at 323, 106 S.Ct. 2548.

Once the movant meets that initial burden, the "burden shifts to the nonmoving party to set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)). Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and submit admissible evidence supporting its position. *Celotex, supra,* 477 U.S. at 324, 106 S.Ct. 2548.

In deciding a motion for summary judgment, I accept the opponent's evidence as true and construe all evidence in the opponent's favor. *Eastman Kodak Co. v. Image Tech. Servs., Inc.,* 504 U.S. 451, 456, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). The movant can prevail only if the materials offered in support of the motion show there is no genuine issue of material fact. *Celotex, supra,* 477 U.S. at 323, 106 S.Ct. 2548.

### Discussion

Defendants move for summary judgment on all three counts: 1) use of excessive force; 2) assault and battery; and 3) policy or custom that resulted in deprivation of constitutional rights. Because plaintiff does not respond to defendants' arguments regarding the third count, he has abandoned that claim. *Clark v. City of Dublin,* 178 Fed.Appx. 522, 524–525 (6th Cir.2006). Thus, I only address the excessive force and assault and battery claims.

▆ To state a § 1983 claim, a plaintiff must allege facts that establish the deprivation of a right secured by the Constitution caused by a person acting under the color of state law. *Sigley v. City of Parma Heights,* 437 F.3d 527, 533 (6th Cir.2006)

(citing *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988)).[1]

Carnahan claims the Defiance police officers used excessive force when arresting him in violation of the Fourth Amendment. Defendants have raised the affirmative defense of qualified immunity.[2]

▆ In determining whether the officers used excessive force, I take the evidence in the light most favorable to the plaintiff but also from the perspective of a reasonable officer on the scene. *Grawey v. Drury,* 567 F.3d 302, 309 (6th Cir.2009). The Supreme Court has held "all claims that law enforcement officers have used excessive force ... in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). In applying this standard, I balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham, supra,* 490 U.S. at 396, 109 S.Ct. 1865 (internal quotations omitted).

▆ I look, moreover, to the totality of the circumstances and "pay particular attention to 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Kostrzewa v. City of Troy,* 247 F.3d 633, 639 (6th Cir.2001) (quoting *Graham, supra,* 490 U.S. at 396, 109 S.Ct. 1865).

---

1. Defendants do not dispute that the police officers were acting in their official capacities under color of state law.

2. I do not reach the issue of qualified immunity under either federal or state law, as I conclude that no rational jury could find that the force the officers used violated either the federal Constitution or state tort law.

■ Furthermore, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham, supra,* 490 U.S. at 396, 109 S.Ct. 1865.

■ Defendants concede that Officers McClure, Naton, and Wellman used force against Carnahan. They admit to striking and tasing him while trying to subdue and arrest him. They argue, however, that the officers used reasonable force under the circumstances. Defendants contend that plaintiff had just slashed his girlfriend's car tires with a kitchen knife,[3] assaulted her in front of her children, fought with a private citizen, resisted arrest, and kicked and punched the officers.

Additionally, defendants argue that Carnahan attacked Officer McClure and tried to gain control of his loaded gun as McClure was attempted to arrest him. Defendants contend that when Officers Naton and Wellman arrived for backup and tased Carnahan, the taser had no effect on him and he continued to fight the officers and resist arrest. Thus, defendants argue that any reasonable officer, confronting and seeking to apprehend a suspect believed to have just engaged in violent activity, would have used similar force, which the defendants contend was proportional, in the same or similar circumstances.

Plaintiff contends that defendants do not construe the evidence in the light most favorable to him. He argues that independent eyewitnesses dispute every material allegation against him, including the allegation that he tried to gain control of Officer McClure's gun and that the officers used proportionate force against Carnahan.

In response, defendants contend much of the eyewitnesses' testimony does not result in any genuine issues of material fact. This is so, they argue, because much of the eyewitnesses' testimony about the alleged excessiveness of the force is inadmissible opinion, which the witnesses are not qualified to offer. This is correct: none of the witnesses is an expert on proper police procedures in a situation such as that which the officers encountered. Likewise, in contrast to the emergency room physician, who stated the plaintiff's injuries were minor, none of the witnesses was qualified to render an opinion as to the nature of plaintiff's injuries. Moreover, their view of the plaintiff was under lighting and other conditions entirely different from those in a hospital emergency room.

Similarly, the witnesses' ability to observe what was happening while the officers were trying to bring the plaintiff under control undercuts their purported observations so substantially that no rational jury could credit their accounts. They were viewing the incident in darkened lighting. Some were being interviewed by officers, and thus were distracted, and did not observe the encounter continually. Thus, Betty Huston testified on deposition that she "couldn't get a real view of [Carnahan]" and could not recall "who was doing what." (Doc. 53, at 26).

Further, when asked in her deposition, "So did you actually see any police officers hitting Mark Carnahan?" she replied, "No, I just seen the arms flying." (Doc. 53, at 36). Thus, her inability to observe much of the events that transpired indicates a lack of knowledge about what exactly happened during the fight.

---

**3.** Plaintiff disputes the contention that he had slashed the tires. That dispute is immaterial: there is no dispute that the officers were informed and believed that he had done so.

Therefore, I also give little weight to her statement that Carnahan was not the first aggressor. Sharp, who was in closer proximity of the fight, testified that when he let go of Carnahan, Carnahan immediately ran from the police. (Doc. 51, at 11). An officer then tackled Carnahan to the ground. Carnahan then began kicking at another officer who approached them. *Id.* at 12. Thus, from plaintiff's own eyewitness, Carnahan was the aggressor.

Here, there is no doubt that the officers were striking plaintiff with great force. However, as the eyewitnesses also testified, Carnahan continued to resist arrest the entire time, despite the officers' repeated commands to stop resisting. Adkins testified that despite the officers tasing Carnahan, he continued resisting arrest. (Doc. 50, at 24). He further stated that the officers were yelling "stop resisting, calm down, stop resisting" but Carnahan continued to evade arrest and that Carnahan was "trying to get away all the way until they finally got the cuffs on him, both hands behind his back." *Id.* at 25.

Sharp's statement to Officer McClure corroborates Adkins' testimony. Sharp stated that as soon as he got off of Carnahan, Carnahan "got out of control, started kicking, fighting and resisting." (Doc. 48–1, at 51). I give little weight to Cynthia Huston's testimony that Carnahan was not resisting police, (Doc. 52, at 18), because she also testified that she could not really see Carnahan from where she was standing because it was dark out. *Id.* at 25.

■ In the Sixth Circuit, "[i]f a suspect actively resists arrest and refuses to be handcuffed, officers do not violate the Fourth Amendment by using a taser to subdue him." *Hagans v. Franklin County Sheriff's Office,* 695 F.3d 505, 509 (6th Cir.2012). However, there is excessive force if officers use a taser when suspects

are compliant or stopped resisting. *Id.* (compiling case law). Here, by both the accounts of Sharp and Adkins, Carnahan was actively resisting the police officers and was fighting with them. Thus, it is reasonable that the officers used force, including tasing, to subdue him. It is also reasonable that it took longer for the officers to secure Carnahan as he seemed to be high according to Adkins. (Doc. 50, at 27).

Plaintiff's argument that Sharp had already subdued Carnahan and thus the officer's actions were not necessary is not persuasive. The officers were responding to a fluid situation in which it was still early in the morning and dark. Officer McClure did not know who Sharp was or whether Carnahan was armed. All he knew was that the Hustons made two 911 calls that morning, Carnahan had just beaten his girlfriend in front of her children, and he fled the scene. It is not unreasonable that Officer McClure released a trained police dog on Carnahan for his own safety and the safety of others.

Additionally, whether Carnahan continued kicking at the officers while he was restrained on a stretcher is not a material fact. At that point, he was already secured and the officers had stopped punching, kicking, and tasing him.

Thus, without even considering whether plaintiff attempted to take Officer McClure's gun, it is clear that the officers did not use excessive force in securing Carnahan, who according to the accounts of key eyewitnesses, was continually resisting throughout the fight.

Moreover, and, in my view, conclusively, Carnahan acknowledged in his deposition that he was trying to grab for something at the officer's front. This could only have been his firearm. That being so, under no circumstance could a rational jury con-

clude that the force the officers used was constitutionally excessive.

Viewing this evidence in the light most favorable to the plaintiff but also from the perspective of a reasonable officer, I find that even if Carnahan did not intentionally try to take Officer McClure's weapon, it is reasonable that Officer McClure believed Carnahan was attempting to do so. Carnahan was resisting arrest and then grabbed the gun. A reasonable officer would fear for his own safety and would use force to stop the person from stealing a loaded gun and harming others. Thus, in light of Carnahan admitting that he held onto the gun, there is even more evidence that the defendants' actions were not excessive.

Additionally, the medical evidence reveals that while Carnahan did suffer injuries, they were relatively minor given the amount of chaos going on. As already noted, the results of the medical examination almost immediately after the arrest and alleged beating, provide stark and indisputable physical proof that the force was not excessive. Had it been as extensive and violent as the witnesses contended, plaintiff's injuries would have manifested that fact. But those injuries show, instead, that the officers did not violate the Constitution in their efforts to bring the plaintiff under control, subdue, and arrest him.

To conclude, there is no dispute that: the officers believed plaintiff had just committed violent acts, may have been armed with a knife, and was affected by some substance; though initially subdued by Sharp, he sought to flee; when officers undertook to seize him, he vigorously resisted their efforts; on being subdued, plaintiff received immediate attention, first from EMT personnel and then in the emergency room, where no significant injuries were observed.

In light of these uncontested and incontestable facts, no rational jury could find that the officers used excessive force. Likewise, no rational jury could find that they committed any state law torts during the encounter.

That being so, it is not necessary to adjudicate the issue of immunity.

### Conclusion

It is, accordingly,

ORDERED THAT defendants' motion for summary judgment (Doc. 48) be, and the same hereby is granted.

So ordered.